# BOARD OF EDUCATION OF CITY OF LOS ANGELES v. SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES (CRAWFORD ET AL., REAL PARTIES IN INTEREST)

No. A-214.  Decided September 12, 1980

MR. JUSTICE REHNQUIST, Circuit Justice.

The Board of Education of the Los Angeles Unified School District requests that I stay an order of the California Supreme Court, dated August 27, 1980, which left standing an order of the Superior Court of the State of California for Los Angeles County requiring mandatory reassignment of between 80,000 and 100,000 first- through ninth-grade students attending approximately 165 elementary and junior high schools pending consideration by this Court of its petition for certiorari.  On July 7, 1980, the Superior Court entered its final remedial order in this action, finding that the Board had participated in racial discriminatory practices which led to the segregation in the school district and requiring the Board to implement a mandatory busing plan pursuant to guidelines contained in the order.  The Board applied to the

Court of Appeal of California to stay the Superior Court's order and, on August 6, 1980, that court partially stayed the order insofar as it relied on a definition of a desegregated school as one where there is a plurality of white students not in excess of 5% over the next largest ethnic group in the school and insofar as it required mandatory busing of students currently attending substantially desegregated schools. The Court of Appeal, however, in all other respects denied the Board's petition for a stay, thus precipitating the current situation where upwards of 80,000 pupils will be bused at the start of school on Monday, September 16, 1980. The court also accelerated the date of oral argument so that the appeal could be heard in January 1981. On August 27, 1980, the California Supreme Court denied, without opinion, the Board's application for a writ of mandamus and/or prohibition to stay in its entirety the order of the Superior Court and recommended that the Court of Appeal accelerate oral argument even further. The California Supreme Court also denied a motion by the original plaintiffs in this action, minority schoolchildren, to vacate the partial stay entered by the Court of Appeal.

This case comes to me after extensive and complicated litigation. Briefly stated, in 1970, the Superior Court issued an opinion finding that the segregation in the school district was *de jure* in nature and that the Board had taken "affirmative" steps which it "knew or should have known" would perpetuate segregation in the district. The specific items detailed in the court's findings included the Board's adoption of (1) a neighborhood school policy, (2) an "open transfer" policy, (3) a "feeder school" policy, and (4) "mandatory attendance areas." In *Crawford* v. *Board of Education,* 17 Cal. 3d 280, 551 P. 2d 28 (1976), the California Supreme Court accepted the finding of *de jure* segregation, but did not base its affirmance of the Superior Court's order of mandatory busing on that ground, holding instead that the California Con-

stitution permitted busing to be ordered regardless of the cause of segregation. On September 8, 1978, I denied a stay for this reason. *Bustop, Inc.* v. *Los Angeles Board of Education,* 439 U. S. 1380 (in chambers).

During remand, the California Constitution was amended by way of a state referendum, Proposition I, adopted in November 1979 to eliminate state independent grounds as a basis for court-ordered busing, and the Board contended that the Superior Court's 10-year-old findings did not justify a finding of a federal constitutional violation or the system-wide remedy of mandatory assignment of children by race. In its July 7, 1980, order, the Superior Court apparently rejected that argument, reasoning that the California Supreme Court, in *Crawford,* affirmed the finding of *de jure* segregation. Contrary to the assertions of the respondents, it seems to me that this application necessarily turns on a question of federal constitutional law, as other courts have held. Indeed, I find myself unable to articulate the point better than Judge Cohn of the Superior Court of San Mateo County in *Tinsley* v. *Palo Alto Unified School District,* No. 206010 (July 10, 1980):

> "Turning to the argument that Proposition I violates the 14th Amendment of the U. S. Constitution, inasmuch as it merely limits California courts to what the federal courts can do under the federal constitution, it is indeed difficult to accept the contention that by limiting a state court's jurisdiction to that of the federal courts, there is somehow a violation of [the] federal constitution."

There is an initial question as to whether this Court would have jurisdiction over the present action if a petition for writ of certiorari were filed. In *Fisher* v. *District Court,* 424 U. S. 382, 385, n. 7 (1976), this Court stated:

> "The writ of supervisory control issued by the Montana Supreme Court is a final judgment within our jurisdic-

tion under 28 U. S. C. § 1257 (3). It is available only in original proceedings of the Montana Supreme Court . . . and although it may issue in a broad range of circumstances, it is not equivalent to an appeal. . . . A judgment that terminates original proceedings in a state appellate court, in which the only issue decided concerns the jurisdiction of a lower state court, is final, even if further proceedings are to be had in the lower court. *Madruga* v. *Superior Court,* 346 U. S. 556, 557 n. 1 (1954). . . ."

In this action, the Board's petition for a writ of mandamus and/or prohibition was a distinct lawsuit which was fully and finally determined by the California Supreme Court's judgment of August 27, 1980. I am thus persuaded that this Court would in all probability have jurisdiction over the present action should a petition for certiorari be filed by the Board.

There is no question here as to the standing of the Board, since it is a party to an action which has been required by the Superior Court (respondent) to mandatorily reassign an extraordinarily large number of students in what the Board claims is the largest school district in the Nation. There might be some question of "standing" if the petitioners were a group of whites, "Anglos," or whatever the current terminology used to describe them is, for if the latest 1979 school census submitted by the Board in its application is to be credited, they themselves would be a "minority." That census indicates that in kindergarten and the first three grades of the school affected by the busing order, students classified as "white" ranged from 17.9% to 21.9% of the school population, those classified as "black" ranged from 18.3% to 22.1%, and those classified as "Hispanic" ranged from 57.8% to 48.9%. Application, at 18 (compiled from trial exhibit 11B).

As seems typical with school cases, applications for stay are presented to a Circuit Justice of this Court close to the

opening of school. It appears that the process leading to the formulation of a mandatory busing plan, and the inevitable challenge to it, takes time which apparently is devoted in sufficient amount only as the deadline of school opening approaches. And as has been noted before in many Circuit Justices' opinions, the Circuit Justice faces a difficult problem in acting on a stay. The Justice is not to determine how he would vote on the merits, but rather forecast whether four Justices would vote to grant certiorari when the petition is presented, predict the probable outcome of the case if certiorari were granted, and balance the traditional stay equities. All of this requires that a Justice cultivate some skill in the reading of tea leaves as well as in the process of legal reasoning.

The thrust of the Board's petition is that the Superior Court, by relying on the 1970 finding of *de jure* segregation, erroneously found that the Board had violated the Fourteenth Amendment. The Board contends that the Superior Court was required to conduct a hearing as to the existence of a federal constitutional violation rather than rely on 10-year-old findings, since the case law as to what constitutes *de jure* segregation has changed in those years. Were this case presently before the entire Court on certiorari, I would in all probability vote to grant certiorari, since it seems to me that on the basis of the application the findings are even less supportive of a constitutional violation than were those upheld in *Columbus Board of Education* v. *Penick*, 443 U. S. 449 (1979), and *Dayton Board of Education* v. *Brinkman*, 443 U. S. 526 (1979). But that is not the question before a Circuit Justice, and I do not think I in good conscience could say that four Justices of this Court would vote to grant certiorari in this case. One factor militating against the granting of certiorari here is that the Court of Appeal has recognized that the significance of the *Crawford* court's "affirmance" of the finding of *de jure* segregation is ambiguous and it has indicated that it will carefully review the Superior Court's find-

ings of a constitutional violation on review this fall or early next year.

Because the merits of the Board's argument are not free from doubt, the proper disposition of this application for a stay turns on the equities. The Board's primary contention here is that "white flight," which all parties concede has taken place in the school district, will accelerate if this plan is put into effect. Not only will increased "white flight" injure the Board in financial terms, such as in reduced pupil reimbursement from the State, but also a reduction in the number of white students in the district will defeat any hope of further desegregating the schools in the district. Indeed, the Superior Court found that over the past two years, when a mandatory busing plan has been in effect, the district has lost 50,000 white students and that 25,000 of those students withdrew from the district to avoid mandatory reassignment. Because projections indicated that the school district in 1987 will consist of only 14% white students, the Superior Court asserted that its task was to achieve the optimal use of white students in the schools so that the maximum number of schools may be desegregated.

I find this analysis somewhat troublesome, since it puts "white" students much in the position of textbooks, visual aids, and the like—an element that every good school should have. And it appears clear that this Court, sooner or later, will have to confront the issue of "white flight" by whatever term it is denominated, *Estes* v. *Metropolitan Branches of Dallas NAACP*, 444 U. S. 437, 438 (1980) (POWELL, J., dissenting from the dismissal of a writ of certiorari as improvidently granted). As MR. JUSTICE POWELL has observed: "A desegregation remedy that does not take account of the social and educational consequences of extensive student transportation can be neither fair nor effective." *Id.*, at 452.

The Court of Appeal here has partially mitigated the potential harm to the Board resulting from "white flight" by rejecting the Superior Court's rigid definition of a desegre-

gated school as one in which there is a plurality of white pupils not in excess of 5% over the next largest ethnic group in the school and by prohibiting mandatory reassignment of students to or from a school which is substantially desegregated. Nonetheless, upwards of 80,000 students will still be bused, although even with school to begin on September 16th it appears from the Board's own application to this Court that the "exact number and identity of all participating schools have not been finalized." I think that a stay granted less than a week before the scheduled opening of school, when school officials and state courts are still trying to put in place the final pieces of a plan, would not be a proper exercise of my function as a Circuit Justice, even though were I voting on the merits of a petition for certiorari challenging the plan I would, as presently advised, feel differently. The application for a stay is accordingly

*Denied.*

## STATEMENT SHOWING THE NUMBER OF CASES FILED, DISPOSED OF, AND REMAINING ON DOCKETS AT CONCLUSION OF OCTOBER TERMS 1977, 1978, AND 1979 (AS OF JULY 2, 1980)

| Terms | ORIGINAL | | | PAID | | | IN FORMA PAUPERIS | | | TOTALS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1977 | 1978 | 1979 | 1977 | 1978 | 1979 | 1977 | 1978 | 1979 | 1977 | 1978 | 1979 |
| Number of cases on dockets | 14 | 17 | 23 | 2,341 | 2,379 | 2,509 | 2,349 | 2,335 | 2,249 | 4,704 | 4,731 | 4,781 |
| Number disposed of during terms | 3 | 0 | 1 | 1,911 | 1,954 | 1,982 | 1,953 | 1,985 | 1,828 | 3,867 | 3,939 | 3,811 |
| Number remaining on dockets | 11 | 17 | 22 | 430 | 425 | 527 | 396 | 350 | 421 | 837 | 792 | 970 |

| | TERMS | | |
|---|---|---|---|
| | 1977 | 1978 | 1979 |
| Cases argued during term | 172 | 168 | 156 |
| Number disposed of by full opinions | 153 | 153 | [1] 143 |
| Number disposed of by per curiam opinions | 8 | 8 | [2] 12 |
| Number set for reargument | 9 | 8 | 1 |
| Cases granted review this term | 162 | 163 | 158 |
| Cases reviewed and decided without oral argument | 129 | 110 | 124 |
| Total cases to be available for argument at outset of following term | 75 | 79 | 78 |

[1] Includes Nos. 5, 9, 27, 67, and 73 Orig.
[2] Includes Nos 79-492 and 65 Orig.

SEPTEMBER 18, 1980