[Civ. No. 60000. Second Dist., Div. Two. Dec. 19, 1980.]

MARY ELLEN CRAWFORD, a Minor, etc., et al.,
Plaintiffs and Respondents, v.
BOARD OF EDUCATION OF THE CITY OF LOS ANGELES,
Defendant and Appellant;
BUSTOP et al., Interveners and Respondents.

## COUNSEL

McCutchen, Black, Verleger & Shea, G. William Shea, Peter W. James, David T. Peterson, Michael M. Johnson and Jerry F. Halverson for Defendant and Appellant.

Fred Okrand, Mark D. Rosenbaum, Mary Ellen Gale, Antonio Rodriguez, Halvor T. Miller, Manning & Reynolds, Manning & Roberts, Shockley, Duff & Hart-Nibbrig, Lawrence B. Trygstad, Janice M. Gordon and Richard J. Schwab, Paul Hoffman and Douglas Mirell for Plaintiffs and Respondents.

Cliff Fridkis for Interveners and Respondents.

## OPINION

**THE COURT.\***—The issues are whether the amendment to article I, section 7, subdivision (a), of the California Constitution, adopted November 6, 1979, on pupil school assignment and pupil transportation (Prop. 1) violates the United States Constitution, and, if it does not, whether the remedial order entered by the superior court on July 7, 1980, in the Los Angeles School District desegregation cause entitled *Crawford* v. *Board of Education* contravenes article I, section 7, subdivision (a) of the California Constitution.

---

\*Before Roth, P. J., Fleming, J., and Compton, J.

The school board (Board) of the Los Angeles Unified School District (District) has appealed to this court from orders of the Los Angeles Superior Court entered May 19, 1980, and July 7, 1980. The May 19 order declined to rule on the constitutionality of Proposition 1, and held that in any event the amendment had no application to this cause. The July 7 order was one of a series of remedial orders entered pursuant to a judgment granting a writ of mandate, a judgment originally issued in 1970 by the Los Angeles Superior Court. In 1976 the California Supreme Court modified and affirmed the judgment granting the writ (*Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28]), and remanded the cause to the trial court to require the Board to prepare a "reasonably feasible plan" to alleviate the harmful consequences of racial segregation in the schools within the District. On remand, the Board in response to the writ submitted to the superior court a plan which focused on pairing and clustering of selected schools, creation of magnet schools, and a plan of voluntary "busing" for students with parental consent. The major thrust of the Board's plan was to encourage voluntary desegregation.

The trial judge (not the judge who originally tried the cause) made it clear early in the proceedings that nothing short of a plan involving large-scale mandatory reassignment of pupils on a racial and ethnic basis would be satisfactory. At the commencement of the school year in the fall of 1978 he brought about the implementation of such a plan. After a year's experience with the plan all parties were dissatisfied with the plan, and were agreed that it had failed to achieve its objective.

On November 6, 1979, the voters of the state approved Proposition 1, an initiative measure which amended article I, section 7, subdivision (a), of the California Constitution.[1] The effect of the amendment was

---

[1]"ARTICLE I. DECLARATION OF RIGHTS

"§ 7. Due process and equal protection; pupil school assignment and transportation (a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; provided, that nothing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation. In enforcing this subdivision or any other provision of this Constitution, no court of this state may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution, and (2) unless a federal court would be permitted under

to prohibit state courts, in desegregation cases, from ordering school boards to mandatorily reassign and transport pupils on the basis of race, except to remedy a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution under circumstances which would authorize a federal court under federal decisional law to issue such an order. The amendment further provided that any previously issued court order which contained a mandatory reassignment provision could be modified by proper application to a court having jurisdiction over the matter, unless modification was precluded by the United States Constitution.

The Board applied to the superior court to modify the plan then in effect by eliminating all mandatory reassignment and "busing" of pupils. On May 19, 1980, the court denied the application on the ground that the original trial court had found the Board guilty of de jure segregation in violation of the Fourteenth Amendment to the United States Constitution. On July 7, 1980, the superior court issued a new order, which, though somewhat different from its 1978 order, required substantial mandatory reassignment and transportation of pupils in the District. We have expedited the appeals from these two orders in accordance with the recommendation of the California Supreme Court.

---

federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

"Except as may be precluded by the Constitution of the United States, every existing judgment, decree, writ, or other order of a court of this state, whenever rendered, which includes provisions regarding pupil school assignment or pupil transportation, or which requires a plan including any such provisions shall, upon application to a court having jurisdiction by any interested person, be modified to conform to the provisions of this subdivision as amended, as applied to the facts which exist at the time of such modification.

"In all actions or proceedings arising under or seeking application of the amendments to this subdivision proposed by the Legislature at its 1979-80 Regular Session, all courts, wherein such actions or proceedings are or may hereafter be pending, shall give such actions or proceedings first precedence over all other civil actions therein.

"Nothing herein shall prohibit the governing board of a school district from voluntarily continuing or commencing a school integration plan after the effective date of this subdivision as amended.

"In amending this subdivision, the Legislature and people of the State of California find and declare that this amendment is necessary to serve compelling public interests, including those of making the most effective use of the limited financial resources now and prospectively available to support public education, maximizing the educational opportunities and protecting the health and safety of all public school pupils, enhancing the ability of parents to participate in the educational process, preserving harmony and tranquility in this state and its public schools, preventing the waste of scarce fuel resources, and protecting the environment." (Amended Nov. 6, 1979.)

We consider first the appeal from the May 19 order, for the reason that if the newly enacted amendment to article I, section 7, subdivision (a) of the California Constitution precluded the trial court from ordering mandatory reassignment of pupils, the appeal on the merits of the July 7, order would become moot. Plaintiffs contend that the original findings of the trial court in this cause found the Board guilty of de jure segregation in violation of the Fourteenth Amendment to the United States Constitution, thereby making inapplicable to this cause the limitation imposed by the amendment to the California Constitution brought about by Proposition 1 is itself unconstitutional and violative of the United States Constitution.

## I

Both California and federal law pertaining to segregation in the public schools have a common origin in the United States Supreme Court decision of *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180]. But thereafter California and federal law followed parallel but somewhat different courses. As we will develop, *infra*, the clear impact of Proposition 1 is to bring one aspect of California law into conformity with federal law.

The United States Supreme Court decisions, starting with *Brown* v. *Board of Education, supra,* have examined the problem of segregation in the public schools of the various states in the light of the equal protection clause of the United States Constitution. The essential holding of *Brown* was that state constitutional and statutory provisions requiring segregation of white and black children in public schools on the basis of race deny black children the equal protection of the laws guaranteed by the Fourteenth Amendment and are therefore void. In rejecting the long-standing separate-but-equal rule of *Plessy* v. *Ferguson* (1896) 163 U.S. 537 [41 L.Ed. 256, 16 S.Ct. 1138], the court in *Brown* held that separate educational facilities are inherently unequal for the reason that the mere fact of legalized segregation generates a feeling of inferiority in the black students. (P. 494 [98 L.Ed. at p. 880].) In essence, psychological trauma was at the heart of the *Brown* decision. Thurgood Marshall, the then counsel of the National Association for the Advancement of Colored People, in arguing before the Supreme Court in *Brown* urged only "that the state-imposed racial segregation be taken off. . . . If school officials were enjoined from enforcing segregation, then I think whatever district lines . . . are drawn on

a natural basis, without regard to race or color, then I think that nobody would have any complaint." (Argument: The Oral Argument Before the Supreme Court in Brown v. Board of Education of Topeka, 1952-1955, pp. 47-49 (Friedman ed. 1969).)

The objective of the *Brown* decision, and of the cases later implementing it, was to dismantle officially imposed dual school systems. Once a dual system has been dismantled and a unitary system established, a school board is under no affirmative federal duty to adjust attendance to comport with shifting and changing neighborhood racial patterns, so long as the changes are attributable to private conduct. (*Pasadena City Bd. of Education v. Spangler* (1976) 427 U.S. 424 [49 L.Ed.2d 599, 96 S.Ct. 2697].) The scope of federal constitutional law in this field was clarified over the ensuing years in a series of decisions rendered by the United States Supreme Court at a time subsequent to the findings and conclusions of the original trial judge herein in 1970.

Clarification began with *Swann v. Board of Education* (1971) 402 U.S. 1 [28 L.Ed.2d 554, 91 S.Ct. 1264], a southern school desegregation case concerning remedies available to a federal court to desegregate a legally segregated school system. Two of its points are relevant here. No particular degree of racial balance or mix is required to desegregate a school. (P. 24 [28 L.Ed.2d at p. 571].) Absent a constitutional violation a federal court has no authority to assign students to schools on the basis of race. (P. 28 [28 L.Ed.2d at pp. 573-574].)

The next development came in *Keyes v. School District No. 1*, Denver, Colo. (1973) 413 U.S. 189 [37 L.Ed.2d 548, 93 S.Ct. 2686], a case of deliberate, intentional racial segregation in a western city. The court declared that to establish unlawful segregation in violation of the Fourteenth Amendment "plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action...[consisting of] an unconstitutional policy of deliberate racial segregation ...." (P. 198 [37 L.Ed.2d at p. 557].) De jure segregation, said the court, comprehends *purpose* or *intent* to segregate. (P. 208 [37 L.Ed.2d at p. 563]; italics in original.)

Thereafter followed the decision in *Washington v. Davis* (1976) 426 U.S. 229 [48 L.Ed.2d 597, 96 S.Ct. 2040], a case involving claimed racial discrimination in police officer tests. In discussing the Fourteenth Amendment's prohibition against official discrimination on the basis of

race, the court declared that the discrimination must be purposeful. In respect to school desegregation it said: "The school desegregation cases have also adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause. The essential element of *de jure* segregation is 'a current condition of segregation resulting from intentional state action.' *Keyes* v. *School Dist. No. 1*, 413 U.S. 189, 205 (1973). 'The differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is *purpose* or *intent* to segregate.'" (P. 240 [48 L.Ed.2d at p. 608]; italics in original.)

Next came *Pasadena City Bd. of Education* v. *Spangler* (1976) 427 U.S. 424 [49 L.Ed.2d 599, 96 S.Ct. 2697], a case involving termination of an existing desegregation plan. The original plan had established a racially neutral school system, said the court, and from that point on the power of the district court to order assignment of pupils to schools on the basis of race came to an end, even though subsequent population shifts had brought about a degree of resegregation. Absent a constitutional violation there is no basis for judicial assignment of pupils on a racial basis. (P. 434 [49 L.Ed.2d at p. 607].)

In *Arlington Heights* v. *Metropolitan Housing Corp.* (1977) 429 U.S. 252 [50 L.Ed.2d 450, 97 S.Ct. 555], where racially discriminatory zoning was charged, the court again noted that proof of racially discriminatory intent or purpose was required to show a violation of the equal protection clause of the Fourteenth Amendment. (P. 265 [50 L.Ed.2d at p. 464].)

Thereafter, in *Dayton Board of Education* v. *Brinkman* (1977) 433 U.S. 406 [53 L.Ed.2d 851, 97 S.Ct. 2766] (*Dayton I*), a school desegregation case, the court once more noted that racial isolation by itself "is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions." (P. 413.) District courts may exercise power over school districts only on the basis of a constitutional violation which results from action by a school board which is intended to, and does in fact, discriminate against minorities. (P. 420 [53 L.Ed.2d at p 859].) The same theme appears in *Milliken* v. *Bradley* (1977) 433 U.S. 267 [53 L.Ed.2d 745, 97 S.Ct. 2749] (*Milliken II*), another northern school desegregation case, where

the court noted that "the Court has consistently held that the Constitution is not violated by racial imbalance in the schools, without more [citations]. An order contemplating the 'substantive constitutional right [to a] particular degree of racial balance or mixing' is therefore infirm as a matter of law." (P. 280 [53 L.Ed.2d at p. 756].)

Most recently, in *Columbus Board of Education v. Penick* (1979) 443 U.S. 449 [61 L.Ed.2d 666, 99 S.Ct. 2941, 2982], the court again observed that the conduct prohibited to school boards is intentional segregation. Plaintiffs must prove that school officials intended to segregate, said the court. "[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation." (P. 464 [61 L.Ed.2d at p. 681].) And in the companion case of *Dayton Board of Education v. Brinkman* (1979) 443 U.S. 526 (*Dayton II*), at page 536, footnote 9 [61 L.Ed.2d 720, 732, 99 S.Ct. 2971], the court said: "We have never held that as a general proposition the *foreseeability of segregative consequences* makes out a prima facie case of purposeful racial discrimination . . . ." (Italics added.)

The foregoing decisions of the United States Supreme Court clearly identify constitutional violations of the Fourteenth Amendment as instances which involve intentional segregative state action taken with discriminatory purpose. In more familiar terms we can describe this intent as specific intent to discriminate. Only such a violation authorizes a federal court to give orders to a local school board on the conduct of school business. A correlative of this rule is that racial isolation which has resulted from causes other than intentional discrimination does not constitute a violation of the Fourteenth Amendment. In sum, the federal Constitution does not require integration, it only prohibits state-compelled segregation. (*Swann v. Board of Education* (1971) *supra*, 402 U.S. 1.) This subsequently developed frame of reference for addressing claims of the denial of equal protection of the laws by reason of racial imbalance in public schools is a natural extension of the rationale of *Brown v. Board of Education, supra*, in that it is intentional or purposeful segregation which produces feelings of inferiority in minority students and the consequent damaging psychological effects.

With the scope of federal law in mind, we analyze the situation as it existed in the District in 1970 at the time the trial court entered its original findings of fact and conclusions of law, a time prior to the clarification we have just discussed of the scope of the Fourteenth

Amendment in school desegregation cases. The trial court's findings and conclusions in substance asserted and deduced the following:

The Los Angeles Board of Education operates some 562 schools with 650,000 students in grades from kindergarten through twelfth grade in an area of 711 square miles.

In 1968 the racial and ethnic composition of the students was 53.6 percent white, 22.6 percent Negro, 20 percent Hispanic, and 3.8 percent Oriental and other.[2]

In 1966 the bulk of the District's schools were either majority white, majority Hispanic, or majority Negro. In 1966, 1967, and 1968 14 new schools were opened, each of which contained a student population which was either majority white or majority Negro. The Board "knew, or in the exercise of reasonable care should have known, at the time of the selection and purchase of the sites...[that these] schools and each of them would upon its opening be racially imbalanced and either Negro segregated or minority segregated or white segregated."

From 1966 to 1968 the number of minority segregated schools in the district increased. In 1968 the bulk of minority pupils attended schools having well above 50 percent combined minority enrollment, and the bulk of white pupils attended schools having well above 50 percent white enrollment.

In 1970, the trial court found that substantial segregation existed in the District in that a number of schools met the trial court's definition of a segregated school—a school with "substantially more than 49 percent of minorities, or any one thereof, or substantially more than 50 percent whites." At that point the racial and ethnic composition of the students in the District was 53.6 percent white, and 46.4 combined minorities.

The Board caused this factual segregation, the court deduced: By mandating neighborhood schools; by site selection; by mandating school

---

[2]In October 1980 the composition of the student population was White 23.7 percent, Black 23.3 percent, Hispanic 45.3 percent, Oriental and other 7.7 percent. The number of white pupils in grades K-3 had fallen to 16.1 percent.

attendance areas and boundaries; by adopting transfer and transportation policies ineffective for integration.

Subsequent to 1963, said the court, none of the school sites or school attendance boundaries selected by the Board was designed to effectuate desegregation or integration.

The court also found, without any specifics, that plant, teachers, physical facilities, and curriculum at the Board's minority schools were in fact of poorer quality than plant, teachers, physical facilities, and curriculum at its predominantly white schools, that minority schools were more crowded than white schools.

The court then concluded that the Board had segregated, de jure, its students through the following policies, practices, and omissions:

Adoption of policies of site selection and neighborhood schools without regard to desegregation or integration.

Establishment of attendance areas and boundaries without regard to its duty to create racially balanced schools and to eliminate segregation. Board practices included assignment of pupils by geographic area and adoption of feeder policies without regard to existing racial imbalance.

Establishment of transfer and transportation policies of which socio-economic disadvantaged students could not take advantage and which failed to provide free transportation for pupils given permits to transfer. As a consequence the socio-economic disadvantaged student was forced to attend a segregated neighborhood school. Open enrollment, said the court, was not a policy to correct racial imbalance but merely a tool of which disadvantaged pupils could not avail themselves.

Restriction to surplus funds of expenditures to create racial balance and provide compensatory educational programs for minorities.

The court asserted that in terms of educational discrimination there is no difference between de jure and de facto segregated schools. It is *not* true, said the court, "that the Federal Constitution only requires integrated education...if the segregation...is of a *de jure* nature." (Finding V.6.) It is virtually impossible, said the court, for neighborhood schools which are in fact segregated to have only de facto segregation. (Conclusion VII.)

There was no finding by the trial court that the Board ever had a policy or program which denied admission to any school or required attendance at any school on the basis of race. Nor was there any finding that the Board ever gerrymandered attendance zones to create or preserve segregated schools.

Patently, the trial court in 1970 took the view that the federal Constitution required elimination of school segregation, regardless of its cause and irrespective of the existence of state action intended with discriminatory purpose to bring about segregation. On this basic premise the trial court deduced the existence of de jure segregation from such neutral acts as maintenance of a neighborhood school system, siting of schools in the geographic center of their need, assignment of pupils to neighborhood schools, and failure to provide free transportation for open transfers. Having found a federal constitutional violation, the trial court then declared that a pupil has no right to choose which public school he will attend (V.19(v)), and that the Board has an affirmative duty to provide equal educational opportunity by compelling its pupils to attend schools on the basis of their race or color. (V.19(iii).)

As noted earlier, the trial court made these deductions and inferences in 1970 at a time it did not have the benefit of the more recent decisions of the United States Supreme Court. In the intervening period that court has made it clear that the federal Constitution only authorizes court assignment and transportation of pupils on the basis of race when there has been state action which intentionally segregates with discriminatory purpose. If no such state action has occurred, elimination or alleviation of racial segregation which has resulted from economic causes and from neighborhood residential patterns is a matter left to local school authorities. In the early development of the law implementing *Brown* v. *Board of Education* (1954) *supra*, 347 U.S. 483, the phrases de jure and de facto were used as a kind of shorthand to distinguish between segregation mandated by statute and segregation which had resulted from the operation of demographic, economic, and other voluntary factors. The concept of unlawful segregation, however, rapidly outgrew segregation by statute and came to encompass all state activity designed to bring about racial segregation, whether facially neutral or not. (Cf. *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].) Unlawful segregation in violation of the Fourteenth Amendment was not limited to segregation by statute, regulation, or ordinance, but extended to acts and practices of a school board consciously adopted with discriminatory purpose to create or perpetrate

school segregation. Such acts as establishment of attendance zones, use of mobile classroom units, and use of optional zones, when done with discriminatory purpose and segregative intent, can amount to unlawful segregation. "We emphasize," said the United States Supreme Court, "that the differentiating factor between *de jure* segregation and so-called *de facto* segregation to which we referred in *Swann* is *purpose* or *intent* to segregate." (*Keyes* v. *School District No. 1*, Denver, Colo. (1973) *supra*, 413 U.S. 189, at p. 208 [37 L.Ed.2d 548 at p. 563]; italics in original.) As a result of this and subsequent cases de jure segregation was more accurately identified as purposeful segregation, it was uncoupled from state statutory law, and it was recoupled to state practices. Unconstitutional segregation became precisely defined as intentional, purposeful segregation, one which contained invidious discriminatory purpose. (*Arlington Heights* v. *Metropolitan Housing Corp.* (1977) *supra*, 429 U.S. 252, 265, 266 [50 L.Ed.2d 450, 464-465].) In recent school desegregation cases the labels de facto and de jure have fallen into desuetude and no longer appear to be in general use in United States Supreme Court opinions. (*Columbus Board of Education* v. *Penick* (1979) 443 U.S. 449 [61 L.Ed.2d 666, 99 S.Ct. 2941, 2982]; *Dayton Board of Education* v. *Brinkman* (1979) 443 U.S. 526 [61 L.Ed.2d 720, 99 S.Ct. 2971] (*Dayton II*).) With the advent of the recent, more precise identification of unconstitutional segregation, the terms de jure and de facto segregation appear to have outlived their usefulness, and a federal constitutional violation of the Fourteenth Amendment in a school desegregation cause is now accurately identified as state action taken with specific segregative intent and discriminatory purpose.

When the 1970 findings of the trial court are reviewed in the light of the correct applicable federal law, it is apparent that no specific segregative intent with discriminatory purpose was found. The thrust of the findings of the trial court was that passive maintenance by the Board of a neighborhood school system in the face of widespread residential racial imbalance amounted to de jure segregation in violation of the Fourteenth Amendment.

The essence of the trial court's findings is synthesized in the following paragraph: "Board had, and knew that it had, the power and *the duty* specially imposed by law upon it, though denied by it: *To adopt school assignment policies* that would incorporate other than geographical criteria, i.e., policies *that would rectify the existing racial imbalances and that would create or tend to create racial balance and*

*integration*; to select school sites for that aim, purpose and end; *to readjust attendance zones and areas and to select school sites to meet and overcome the effect of population movement.* It knew, or should have reasonably known, of the population movements within its District. Board did not execute or perform these or any of those powers or perform those or any of those duties specially imposed by law upon it." (Italics ours; finding IV.36.)

But a school board has no duty under the Fourteenth Amendment to meet and overcome the effect of population movements. "That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause." (*Washington* v. *Davis* (1976) 426 U.S. 229, at p. 240 [48 L.Ed.2d 597, 608, 96 S.Ct. 2040].) And, as the court said in *Dayton Board of Education* v. *Brinkman* (1977) 433 U.S. 406, 413 [53 L.Ed.2d 851, 859, 97 S.Ct. 2766], (*Dayton I*), "The finding that the pupil population in the various Dayton schools is not homogeneous, standing by itself, is not a violation of the Fourteenth Amendment . . . ." When the trial court at bench concluded in 1970 that such a duty was required by federal law, the trial court clearly erred as a matter of law. Since the trial court's characterization of the Board's action as de jure segregation was a conclusion of law rather than a finding of fact, we are not bound by it. (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 238 [82 Cal.Rptr. 175, 461 P.2d 375]; *Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 963 [88 Cal.Rptr. 188, 471 P.2d 988].)

In sum, no federal violation of law was established by the 1970 findings, and the trial court's identification of the then existing racial segregation within the Los Angeles school system as de jure segregation was true only in a Pickwickian sense, and was not true at all in the sense of federal law. Because there was no evidence of acts done with specific segregative intent and discriminatory purpose, there was no federal constitutional violation—regardless of the terminology used by the court.

One further element which bears tangentially on the question of intentional segregation with discriminatory purpose is the trial court's finding that the plant, teachers, physical facilities, and curriculum of minority schools were of poorer quality than those of predominantly white schools and that overcrowding in minority schools was greater than in white schools. This finding, however, did not assert that the lower quality of minority schools resulted from intentional segregation with

discriminatory purpose but merely concluded that the Board knew or should have known of the differential in quality between the two sets of schools. Absent some specific intent on the part of the Board to maintain inferior minority schools in order to perpetrate racial segregation, its delinquency in this respect raises separate issues which are curable by separate remedies. If older schools in central districts are rundown and overcrowded and have not received the extra maintenance owed to them by reason of their age, and if senior teachers prefer to teach in suburban schools rather than in central schools, the Board must take positive action to equalize school facilities and equalize the quality of teaching throughout its several schools. Such has been the law in California for many years, most conspicuously set out in *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241]. The court there observed that in instances of unequal expenditures for schools the discrimination is one based on wealth and not on race. (P. 604.) So here. The problem of unequal facilities is not directly connected with the problem of racial segregation. The problem of differential quality among schools is not solved by assignment of pupils to particular schools on the basis of race, but is solved by allocation of extra money and assignment of senior teachers to the poorer schools. The two problems frequently parallel one another but they are distinct and different problems. Only the problem of racial and ethnic segregation is directly involved in the cause at bench.

When on appeal this cause reached the California Supreme Court, *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28], that court squarely based its substantial affirmance of the trial court on the state constitutional ground of equal protection of the laws, determining that under state law the Board had a constitutional duty to alleviate segregation in the schools regardless of cause. The existence of segregated schools in the District, coupled with the Board's failure to take reasonably feasible steps to desegregate its schools, said the court, constituted a sufficient basis to sustain the trial court's order.

The California Supreme Court noted and agreed with the trial court's characterization of the segregation as de jure in nature, but it also noted that whether school districts have an obligation under the federal Constitution to eliminate segregation regardless of cause was an open question and, therefore, it rested its decision on state constitutional grounds. The court then declared that because segregation existed in the schools of the District and the Board had failed to undertake rea-

sonably feasible steps to desegregate its schools, under the California Constitution the Board must be required to take "reasonably feasible steps to alleviate segregation." The trial court could compel the Board to prepare and implement a plan to alleviate segregation and the harmful effects of segregation in the District's schools. The past decade, said the court, has produced literally scores of alternative administrative techniques which may be used to facilitate school desegregation.

The court was mindful of the many problems faced by a school district as large and geographically widespread as the District in attempting to desegregate hundreds of schools at various grade levels. Consequently, the court repeatedly emphasized that the Board's obligation was to take "reasonable and feasible steps" to alleviate segregation where it existed. The Board was not, and is not, said the court, obliged to achieve absolute racial balance in all schools according to the demographics of the entire District. The court eschewed any attempt to define a "desegregated" school in terms of specific percentages, and in that respect it modified the original judgment of the trial court, which had declared that any school with substantially more than 49 percent minorities or substantially more than 50 percent white was a segregated school. The court also said: "[I]n a school district in which 'minority' students significantly outnumber 'majority' students, a school whose racial composition might in some other district make it a 'segregated school' may not warrant that legal characterization." (*Crawford*, p. 304, fn. 16.)

That of course is the existing situation in the District, where white students are now a minority in that they comprise 23.7 percent of the total student population and 16.1 percent of grades K-3. Yet for the purpose of applying the legal principles related to school segregation, whites are still designated as the "majority," and segregation is viewed in terms of the minorities, or any one of them, being isolated from whites.[3]

---

[3]That approach appears to be a hangover from the historic situation in some areas in the country which produced the background against which the decision in *Brown* v. *Board of Education, supra*, was rendered.

The wisdom of, or the need to, perpetuate that approach here is questionable since, when considered in terms of the ethnic composition of the Los Angeles Unified School District, it appears to denigrate the dignity and capability of the minority students. In effect, it implies that ethnic "minority" children, even when they constitute a numerical majority and thus do not suffer the psychological trauma of deliberate isolation, cannot achieve best results except in the presence of a token number of white students.

In anticipation of the provisions of a specific remedial desegregation plan the California Supreme Court first pointed out that no set racial or ethnic percentages were required as a matter of constitutional law or could be established for a particular school in terms of the District's student population. Percentages of various racial or ethnic groups could vary, even significantly, in different schools. The court referred to the scores of administrative techniques for facilitating the desegregation of school systems, including rezoning, (integrative gerrymandering) pairing, clustering, magnet schools, teacher patterns, opening new schools, closing old ones, and free transportation for optional transfer. "Busing," declared the court, is not a constitutional end in itself, but simply one potential tool which may be utilized to satisfy a school district's constitutional obligation. In some circumstances it will provide an appropriate and useful element in a desegregation plan; in others its costs in financial and educational terms will render its use inadvisable. Continuing, the court opined ". . . so long as a local school board initiates and implements reasonably feasible steps to alleviate school segregation in its district, and so long as such steps produce meaningful progress[4] . . . we do not believe the judiciary should intervene in the . . . process. . . .reliance on the judgment of local school boards in choosing between alternative desegregation strategies holds society's best hope for the formulation and implementation of desegregation plans which will actually achieve the ultimate constitutional objective of providing minority students with the equal opportunities potentially available from an integrated education." (*Crawford, supra*, at pp. 305-306.)

From the foregoing recital of the cause and of the United States Supreme Court desegregation decisions we conclude that the racial imbalance and segregation which existed in many schools in the District and the Board's actions in relation thereto did not constitute a violation of the equal protection clause of the Fourteenth Amendment as interpreted by the United States Supreme Court, in that racial imbalance and segregation did not result from Board acts performed with segregative intent and discriminatory purpose. It follows that federal courts would not be authorized under federal decisional law to require pupil school assignment or transportation by race to remedy the imbalance. Thus article I, section 7, subdivision (a), of the California Constitution, as it now reads, operates to prohibit the trial court from ordering as-

---

[4]We interpret that phrase to mean meaningful progress in light of present conditions. A genuine opportunity to show such progress under a plan of its own has not yet been afforded the Board.

signment and transportation of pupils on the basis of race unless this section of the California Constitution itself violates the Fourteenth Amendment to the United States Constitution.

## II

The remaining question is the federal constitutionality of a state constitutional amendment conforming state court use of mandatory assignment and transportation of pupils on the basis of race to that authorized for the federal courts under the Fourteenth Amendment.

California law on the subject of school desegregation has evolved from the opinion of the California Supreme Court in *Jackson v. Pasadena City School Dist.* (1963) 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878]. That case involved a demurrer to a complaint which alleged that the Pasadena City School District had gerrymandered its school attendance boundaries to perpetuate racial segregation in certain schools. The court, relying on *Brown v. Board of Education* (1954) *supra*, 347 U.S. 483, reasserted the proposition that intentional segregation by race in the public schools denies minority students the equal protection of the laws. The issue in *Jackson* was the use by the Pasadena school board of school boundaries designed to perpetuate racial segregation, an allegation which, if true, amounted to intentional segregation with discriminatory purpose in violation of the Fourteenth Amendment. The court, observing that racial imbalance in California schools is usually caused by economic factors and housing patterns rather than by intentional segregation imposed by school authoritites, concluded that even in the absence of officially caused or officially perpetuated segregation, a school board has a duty to affirmatively address the problem of racial imbalance. The court, however, was careful to point out that in performing that duty "... consideration must be given to the various factors in each case, including the practical necessities of governmental operation...the degree of racial imbalance in the particular school...the difficulty and effectiveness of revising school boundaries...and the availability of other facilities to which students can be transferred." (*Jackson v. Pasadena City School Dist., supra*, at p. 882.)

*Jackson* was followed by *San Francisco Unified School Dist. v. Johnson* (1971) 3 Cal.3d 937 [92 Cal.Rptr. 309, 479 P.2d 669], which interpreted *Jackson, supra,* as imposing on California school boards an

affirmative duty to attempt to alleviate racial imbalance or racial isolation.

When the cause at bench, *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28], came before the California Supreme Court, state law on this subject was formally severed from federal law, and school boards were placed under an affirmative duty to undertake reasonably feasible steps to alleviate racial segregation in public schools regardless of the cause of the segregation. The existence of the duty was derived both from state decisional law (*Jackson, supra*, and *Johnson, supra*) and from the equal protection clause in article I, section 7, subdivision (a), of the California Constitution. (*Crawford*, pp. 297, 302.) The cause was then remanded to the trial court with instructions to supervise the preparation and implementation of a reasonably feasible desegregation plan. The trial court was ordered to proceed on the basis of state law, and to utilize such of the "literally scores" (pp. 286, 305) of desegregation techniques as might provide reasonably feasible means for desegregation. The California Supreme Court identified "busing" as merely one of the potential tools that might be utilized.

Subsequent to remand but before the trial court made its definitive order of July 7, 1980, article I, section 7, subdivision (a), of the California Constitution was amended to remove "busing" (pupil school assignment and pupil transportation) from the arsenal of techniques available to a state court to alleviate racial school segregation caused by economic, geographic, and demographic factors and not by intentional segregation with discriminatory purpose. The posture of the cause and the position of those connected with it then became as follows:

The Board remains subject to its constitutional duty under state law to undertake reasonably feasible steps to alleviate school segregation regardless of cause.

In carrying out its duty the Board may utilize any or all desegregation techniques, including pupil assignment and pupil transportation.

The Board is not subject to any federal obligation for violation of the Fourteenth Amendment.

The trial court is under a duty to supervise the preparation and implementation of a reasonably feasible desegregation plan. In the absence

of a Board plan that provides meaningful progress, the trial court is authorized to implement a desegregation plan that may utilize all available desegregation techniques except that of pupil school assignment and pupil transportation.

Thus the effect of the constitutional amendment is to withdraw one desegregative technique from the state court's arsenal of remedies available to alleviate unintended nonpurposeful segregation, but to leave all other available techniques intact.

An amendment which produces such a posture, plaintiffs assert, itself amounts to a violation of the equal protection clause of the federal Constitution, and Proposition 1 is either unconstitutional in its entirety or unconstitutional as applied to this cause. To support their assertion that Proposition 1 is contrary to the Fourteenth Amendment plaintiffs advance three arguments: (1) Proposition 1 removes a previously given state right, (2) it reflects intent to segregate with discriminatory purpose, and (3) it retroactively divests plaintiffs of adjudicated rights.[5]

1. *Removal of a previously given state right.* On this point the keystone in plaintiffs' argument is *Reitman v. Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1157]. That cause involved a California initiative constitutional measure which repealed acts of the Legislature which had prohibited private discrimination in residential housing. But more was involved than removal of a previous state right given to ten-

---

[5]Plaintiffs also argue that Proposition 1 was improperly enacted, because the voters were not notified that it effectively amended sections of the California Constitution other than article I, section 7, subdivision (a), because its title was misleading, and because it violated the single subject requirement. *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], disposes of each of these arguments. That cause dealt with Proposition 13, an initiative which "change[d] the previous system of real property taxation and tax procedure by imposing important limitations upon the assessment and taxing powers of state and local governments." (P. 218.) The court rejected comparable challenges to Proposition 13 and held "that an initiative measure will not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are 'reasonably germane' to each other." (P. 230.) The court noted Proposition 13 consisted of four major elements which it found "reasonably germane to, and functionally related in furtherance of, a common underlying purpose, namely, effective real property tax relief." (P. 230.) The elements of Proposition 1 are likewise reasonably germane to, and functionally related to, the common underlying purpose of elimination of court-ordered pupil reassignment or transportation, unless required to remedy a Fourteenth Amendment violation or unless voluntarily undertaken. (See also, *Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33 [157 Cal.Rptr. 855, 599 P.2d 46], cert. den. 444 U.S. 1049 [62 L.Ed.2d 736, 100 S.Ct. 740] (1980).)

ants not to be the subject of private discrimination. The United States Supreme Court interpreted the new constitutional provision as not merely repealing existing law prohibiting private discrimination, but as state action authorizing private racial discrimination in the housing market as basic policy, which in itself amounted to a violation of the Fourteenth Amendment. Under such circumstances the California constitutional initiative could not survive the Fourteenth Amendment. ■ Proposition 1 does not, of course, create a right to discriminate and does not change any substantive law of rights; it merely removes court-ordered pupil school assignment and transportation as a remedy available to cure state-proscribed racial imbalance in public schools.

Plaintiffs also rely on *Hunter* v. *Erickson* (1969) 393 U.S. 385 [21 L.Ed.2d 616, 89 S.Ct. 557], as authority for the invalidity of Proposition 1. There, an Akron, Ohio, charter amendment required that city ordinances dealing with discrimination on the basis of race, color, religion, national origin, or ancestry in the area of housing must be approved by a majority of voters at a general or regular election. Other ordinances, including ordinances dealing with other forms of discrimination, would become effective 30 days after passage by the city counsel. The United States Supreme Court noted that the Akron charter amendment "was an explicitly racial classification treating racial housing matters differently from other racial and housing matters." (P. 389 [21 L.Ed.2d at p. 621].) This discrimination on the basis of race, religion, or ancestry violated the Fourteenth Amendment "because the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race, ..." (P. 391 [21 L.Ed.2d at p. 622].)

At bench, however, and unlike the Akron charter amendment, Proposition 1 embraces the protection of the Fourteenth Amendment and does not seek to violate it.

■ If a state is not under a federal duty to adopt a particular act in the first place (such as rectification of racial imbalance in its schools which has resulted from population shifts, cf. *Pasadena Board of Education* v. *Spangler* (1976) 427 U.S. 424 [49 L.Ed.2d 599, 96, S.Ct. 2627]) recission of the act cannot be unconstitutional. See *Dayton Board of Education* v. *Brinkman* (1977) 433 U.S. 406, 413-414 [53 L.Ed.2d 851, 859-860, 97 S.Ct. 2766] (*Dayton I*), and *Dayton Board of Education* v. *Brinkman* (1979) 443 U.S. 526 [61 L.Ed.2d 720, 729-730, 99 S.Ct. 2971] (*Dayton II*), where at page 531, footnote 5, the court

said: "Racial imbalance, we noted in *Dayton I*, is not *per se* a constitutional violation, and rescission of prior resolutions proposing desegregation is unconstitutional only if the resolutions were required in the first place by the Fourteenth Amendment." The notion that California could not conform its constitutional right of equal protection of the laws to that guaranteed by the federal Constitution appeared startling to Justice Rehnquist, who wrote in this case: "'Turning to the argument that Proposition 1 violates the 14th Amendment of the U.S. Constitution, inasmuch as it merely limits California courts to what the federal courts can do under the federal constitution, it is indeed difficult to accept the contention that by limiting a state court's jurisdiction to that of the federal courts, there is somehow a violation of [the] federal constitution.'" (*Board of Ed. Los Angeles* v. *Superior Court* (1980) 448 U.S. 1343, 1345 [65 L.Ed.2d 1166, 1168, 101 S.Ct. 21].)

At oral argument plaintiffs' counsel candidly took the position that if, for example, California should recede from its present restrictive laws on the scope of permissible search and seizure to make them conform to the less stringent restrictions on search and seizure required under the federal Constitution, such California action would violate the Fourteenth Amendment. In effect, California's presently restrictive laws on search and seizure could never be relaxed, either by state or federal action. On this point we note our basic disagreement with counsel, and we conclude that as a matter of federal constitutional law California can conform its constitutional protection of rights in this and other areas to those given under the United States Constitution, even though the specific protection under the California Constitution might have previously exceeded that under the federal Constitution.

In short, we do not believe a state constitutional amendment can be said to violate the Fourteenth Amendment by specifically embracing it.

2. *Improper discriminatory purpose.* The argument here is that Proposition 1 was passed with segregative intent and discriminatory purpose. A sufficient answer may be found in the constitutional amendment itself, which declares the amendment is necessary to make most effective use of the limited resources available for public education, to maximize educational opportunities, to protect the health and safety of pupils, to enhance the ability of parents to participate in the educational

process, and to prevent the waste of scarce fuel resources. We think it pure speculation to suppose that voters who supported Proposition 1's restrictions on mandatory school assignment by race of children outside their home areas were motivated by specific intent to effect racial segregation and by discriminatory purpose. Finally, we also believe the voters who adopted this constitutional amendment could have been motivated without segregative intent and discriminatory purpose by the considerations set out by Justice Powell in *Estes* v. *Metropolitan Branches, Dallas NAACP* (1980) 444 U.S. 437 [62 L.Ed.2d 626, 100 S.Ct. 716] (diss. from a dismissal of writs of certioirari as improvidently granted): "The pursuit of racial balance at any cost—the unintended legacy of *Green*—is without constitutional or social justification. Out of zeal to remedy one evil, courts may encourage or set the stage for other evils. By acting against one-race schools, courts may produce one-race school systems. Parents with school-age children are highly motivated to seek access to schools perceived to afford quality education. A desegregation plan without community support, typically one with objectionable transportation requirements and continuing judicial over-sight, accelerates the exodus to the suburbs of families able to move. The children of families remaining in the area affected by the court's decree are denied the opportunity to be part of an ethnically diverse student body. See *Parents Assn. of Andrew Jackson High School* v. *Ambach*, 598 F.2d 705, 717 (CA2 1979). The general quality of the schools also tends to decline when substantial elements of the community abandon them." (Pp. 450-451 [62 L.Ed.2d at pp. 634-635].)

3. *Deprivation of vested rights.* Plaintiffs' final argument against the application of Proposition 1 to this cause is that it wrongfully deprives minority children of their vested right to a desegregated education. We do not believe any pupil has a vested right to require other pupils to be assigned to public schools on the basis of race. ■ The sole vested right involved, if that is the proper phrase, is the right of a pupil to receive an education which is not intentionally segregated and to attend a school where the school board has performed its duty to take all reasonable steps to alleviate segregation, regardless of cause. This right, recognized in *Crawford, supra,* has not been removed by Proposition 1, which does not purport to change the duty imposed on a school board by California law to take all reasonably feasible steps to alleviate racial segregation in its schools regardless of cause. All the amendment does is remove from the courts the remedy of pupil school assignment and pupil transportation as one among scores of remedies available for use by

a court to end racial isolation. Perhaps an illustration divorced from the emotional connotations attached to "busing" will clarify the point. Suppose a constitutional amendment had been adopted removing from the courts the authority to require use of magnet schools as a remedy for racial imbalance and racial isolation. (From time to time magnet schools are attacked as elitist institutions which drain away the brightest pupils from the regular schools, to the disadvantage of those who are left.) A state policy against court-compelled use of magnet schools as a technique to alleviate racial imbalance contrary to state law might be ill-advised, but we do not believe a student could claim a federal constitutional right to attend a magnet school and a federal constitutional right to require a school district to operate one, even though a state court had written approvingly about the use of magnet schools as a desegregative technique in a desegregation action brought on behalf of the student. All that the constitutional amendment has done, both in the hypothetical case and in our real case, is to remove one remedy from future court enforcement of a state constitutional right. Prior to the passage of Proposition 1 no particular remedy had been ordered into effect by the California Supreme Court, and no particular remedy had been mandated. We find the claim of vested right inapplicable.

In sum, article I, section 7, subdivision (a), does not intentionally authorize or perpetuate segregation with discriminatory purpose. Nor does it remove the duty of a school board under state law to affirmatively address the problem of racial imbalance in the schools. It divests no vested rights. In requiring that remedial aspects of the duty to desegregate conform to the requirements of the Fourteenth Amendment as interpreted by the decisions of the United States Supreme Court, it merely provides a more precise contour to the duty established by California law and court decisions to desegregate public schools regardless of cause. (Cf. *Brown* v. *Califano* (D.C.Cir. 1980) 627 F.2d 1221.) We conclude that Proposition 1 does not violate the federal Constitution and that its application to this cause is constitutional under the Fourteenth Amendment.

The orders of May 19, 1980, and July 7, 1980, are vacated, and the matter is remanded to the trial court for further proceedings consistent with this opinion. It is not our intent to disrupt the operation of the schools during the present semester. Since our decision will not become final for 30 days, the parties have ample time to take whatever legal action they think desirable prior to the commencement of the next school

semester. Our previous orders dated August 6, 1980, and September 4, 1980, staying certain features of the trial court's plan, are continued in force until further order of the court.

A petition for a rehearing was denied January 14, 1981, and the petition of plaintiffs and respondents for a hearing by the Supreme Court was denied March 11, 1981. Bird, C. J., was of the opinion that the petition should be granted.