650 F.2d 1004
 LOS ANGELES UNIFIED SCHOOL DISTRICT, Petitioner,
v.
UNITED STATES DISTRICT COURT FOR the CENTRAL DISTRICT OF
CALIFORNIA, Respondent,
Los Angeles NAACP, Beverly Hills Hollywood NAACP, San Pedro
Wilmington NAACP, Watts NAACP, San Fernando Valley
NAACP, and Carson NAACP, Real Parties in Interest.
 No. 81-7238.
 United States Court of Appeals,
Ninth Circuit.
 June 23, 1981.
As Corrected June 24, 1981.
 
 G. William Shea, McCutchen, Black, Verleger & Shea, Jerry F. Halverson, Los Angeles, Cal., for petitioner.
 Andrea Sheridan Ordin, U. S. Atty., Joseph H. Duff, Los Angeles, Cal., for respondent.
 Before ALARCON, FERGUSON and REINHARDT, Circuit Judges.
 
 
 1
 The petition for writ of mandamus is granted.
 
 FERGUSON, Circuit Judge, dissenting:
 
 2
 On March 16, 1981, the Los Angeles School Board issued a directive requiring cessation of busing as of April 20 within the Los Angeles City School system. Plaintiff NAACP organizations filed an action in the Central District of California against the Los Angeles City School Board, challenging the Board's Order.
 
 
 3
 On April 17, the district judge granted plaintiffs' request for a temporary restraining order to maintain the status quo with respect to busing for ten days. The purpose of this order was to forestall irremediable change pending a hearing on the propriety of granting a preliminary injunction.
 
 
 4
 The next day, Saturday, April 18, the Board filed with this court a petition for a writ of mandate staying operation of the restraining order. My brethren granted that writ on the grounds of collateral estoppel and abstention.[1]
 
 
 5
 I dissent. My review of the record has convinced me that plaintiffs satisfied the burden of showing the elements necessary for the granting of a temporary restraining order, that collateral estoppel plays no role in this case and even if it did there is a separate adequate basis for affirming, and finally that abstention is inappropriate in the instant circumstances.
 
 I. BACKGROUND
 
 6
 A. History and Facts.
 
 
 7
 The history of discrimination in California's public schools preceding the events of this case is painful to recount. From the 1800's until the 1960's, state school systems perpetrated and the courts condoned deliberate racial segregation against blacks, hispanics, and other minorities. Westminster School Dist. v. Mendez, 161 F.2d 774 (9th Cir. 1947) (en banc); Piper v. Big Pine School Dist., 193 Cal. 664, 226 P. 926 (1924). As late as 1971, an Enrollment Survey conducted by the Department of Health, Education and Welfare found that the Los Angeles Unified School District was "among the most segregated in the entire country, with 86.6 percent of black pupils attending schools which were more than 80 percent black." Crawford v. Board of Education, 17 Cal.3d 280, 287 n.1, 130 Cal.Rptr. 724, 551 P.2d 28 (1976).
 
 
 8
 It was not until 1963 that the California Supreme Court followed the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and held intentional racial segregation in public schools unconstitutional. Jackson v. Pasadena City School District, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963). Thereafter, an action was filed against the Board of Education of the City of Los Angeles ("Board") to desegregate its school system. The subsequent eighteen-year history of that case, Crawford v. Board of Education, reveals a concerted effort by the Board to prevent desegregation of Los Angeles' public schools.
 
 
 9
 Crawford was first decided at the trial level in 1970 by Judge Alfred Gitelson of the Los Angeles Superior Court. His unpublished decision found that the Board had engaged in systematic and intentional de jure segregation of the school system.[2] On that basis, he ordered the Board to devise and implement a desegregation plan.
 
 
 10
 In 1976, the California Supreme Court affirmed Judge Gitelson's decision. Crawford v. Board of Education, 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28 (1976), rejected the Board's contention that it had engaged only in neutral, de facto segregation. The court cited the Board's "absolute failure to demonstrate that it had undertaken reasonable steps to attempt to alleviate the segregation in its district's schools" and its adoption of a policy which "had the foreseeable consequence of perpetuating and indeed exacerbating the segregation " 17 Cal.3d at 308, 130 Cal.Rptr. 724, 551 P.2d 28. It declined, however, to base its decision on the de jure/de facto distinction; rather, it held that the distinction was impossible to make and that it was a "legal fiction" preventing ultimate vindication of constitutional rights. Id. at 298-302, 130 Cal.Rptr. 724, 551 P.2d 28.
 
 
 11
 The Board developed its first implementation plan of Crawford's desegregation order in February, 1977. The plan was rejected in the superior court by Judge Paul Egly because it was too limited in scope. A second plan, which included mandatory busing, was permitted by Judge Egly in 1978 as an "important initial step." Finally, a third plan, also involving busing and providing for the clustering and pairing of 155 schools, has been in effect since October, 1980.
 
 
 12
 In November, 1980, the people of California passed Proposition 1, an initiative amending Article I, Section 7(a) of the state constitution. The purpose of the initiative was to limit the power of California courts to require desegregation to cases in which the United States Constitution would require it. See Official Title and Summary Prepared by the Attorney General.[3]
 
 
 13
 Following passage of Proposition 1, the Board sought in superior court to modify the desegregation plan. The Crawford plaintiffs objected. On May 19, 1980, Judge Egly denied the modification, citing the de jure segregation found in the original Crawford action. The court issued a remedial order on July 7.
 
 
 14
 That decision was appealed to the California district court of appeal, which reversed on December 19, 1980. Crawford v. Board of Education, 113 Cal.App.3d 633, 170 Cal.Rptr. 493 (1980). Upholding the validity of Proposition 1, the court overturned the superior court order, finding that it failed to conform to federal constitutional standards. In so doing, the court engaged in a startling recital of events, concluding that Judge Gitelson's findings of de jure segregation from a decade earlier were true "only in a Pickwickian sense, and not true at all in the sense of federal law." Id. at 646, 170 Cal.Rptr. 495. The court apparently reconstructed the 1970 findings and concluded that the trial court had found de jure segregation solely on the basis of inequality in educational opportunities; it thereby ignored the positive acts of exacerbation and aggravation of segregation cited in Judge Gitelson's opinion. The California Supreme Court declined to hear an appeal from that decision.
 
 
 15
 On March 16, 1981, the Board voted to implement a "parent option plan," which totally dismantled all prior desegregation plans including the busing then in effect. The plan, which was to take effect on April 20, resembled the practices outlawed as de jure segregation by Judge Gitelson. On March 26, the Crawford plaintiffs filed a motion for preliminary injunction with the superior court to enjoin the Board's latest action. The motion was denied, as was an appeal to the California district court of appeal. Plaintiffs' emergency petition for a writ of mandate, prohibition or other extraordinary relief is currently pending before the California Supreme Court.[4]
 
 
 16
 On April 15, the Los Angeles chapter of the NAACP, together with the Beverly Hills/Hollywood, San Pedro/Wilmington, Watts, San Fernando Valley, and Carson NAACP chapters, filed suit in the District Court for the Central District of California against the Los Angeles Unified School District, the Los Angeles Board of Education, the Superintendent of Schools, the California State Board of Education, the California Department of Education, the Superintendent of Public Instruction and the Governor of California. The NAACP plaintiffs sought to enjoin temporarily the Board's March 16 Order. Judge Wallace Tashima granted their motion for a temporary restraining order ("TRO") for ten days pending a hearing for issuance of a preliminary injunction.
 
 
 17
 In granting the motion, the district court noted that the parties in interest in the instant federal case are substantially distinct from those in the Crawford state cases. Crawford involved students of many races directly affected by the Board's plans who were seeking relief against the Board. The parties concede that Crawford was not certified as a class action. The plaintiffs in the instant action, by contrast, are NAACP organizations bringing a class action suit on behalf of those directly affected. Furthermore, the defendants in the federal action include defendants never involved in the eighteen years of Crawford litigation. Judge Tashima correctly concluded that persons not party to the original action could not be prevented from seeking relief in federal court on federal causes of action.
 
 
 18
 Judge Tashima next looked to the relevant standards to determine if a temporary restraining order should be issued. He found that a TRO should be granted if plaintiffs raise a serious question that they might prevail on the merits and if they demonstrate a balance of hardship tilting in their favor. He concluded that plaintiffs would raise a serious question if they demonstrated a "fair chance" that they will be able to prove the existence of de jure segregation, followed by intentional segregative actions by defendants and their predecessors. Referring to Judge Gitelson's findings but not binding himself to them, Judge Tashima found that plaintiffs had demonstrated the "fair chance" of success required for a TRO. He also found that the balance of harm fell on the side of the plaintiffs, as no harm would befall defendants if temporarily required to maintain the status quo.
 
 
 19
 Judge Tashima finally found that the March 16 Order was itself passed with segregative intent which warranted an injunction. This conclusion is buttressed by Board members' statements reported to the press during the period in which the March 16 Order was under consideration. (Record, Second Declaration of Joseph H. Duff in Support of Plaintiffs' Motion for Preliminary Injunction, p. 10).
 
 
 20
 Defendants filed an emergency petition for a writ of mandate to the Court of Appeals for the Ninth Circuit on April 18. That petition was granted on Saturday, April 18.
 
 
 21
 B. The Majority Opinion.
 
 
 22
 The majority holds erroneous Judge Tashima's determination that the instant parties are distinct from the Crawford parties. Its conclusory treatment of this issue contradicts evidence in the record distinguishing the plaintiffs in the Crawford actions from those seeking the TRO. (Transcript of Hearing, April 17).
 
 
 23
 The majority next holds it error "as a matter of law for the district court to conclude, solely on the basis of Judge Gitelson's findings, that de jure segregation existed in the past." This language does not accurately describe Judge Tashima's decision. Judge Tashima correctly applied the standard requiring that parties seeking temporary injunctive relief demonstrate a serious question of success on the merits. He did not conclude that de jure segregation existed. Rather, he expressly refused to bind himself to Judge Gitelson's findings, concluding instead that the plaintiffs had presented evidence of a fair chance that they would succeed in demonstrating de jure segregation. Judge Tashima was clearly correct in his result. See part II(c), post.
 
 
 24
 Two days after the original decision was issued, the majority rewrote its opinion in order to provide retroactive justification for its original conclusion. I appreciate my brethren's desire to clarify the original decision. (See note 8, post.) I regret, however, that they felt justified in allowing, solely on the basis of their original order, the overnight dismantling of the desegregation system in a school system known to be among the worst discriminatory offenders in the country.
 
 
 25
 I dissent.
 
 
 26
 II. THE ORDER SATISFIED ALL THE REQUIREMENTS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER
 
 
 27
 After notice and hearing, Judge Tashima issued a temporary restraining order preventing the Board from immediately disengaging itself from a complex two and one-half year series of busing plans. That order would have lasted, under Fed.R.Civ.P. 65(b), a maximum of 10 days. Because of their limited duration, TROs are customarily unappealable. 7 Part 2 Moore's Federal Practice P 65.05 at 65-74. Nonetheless, the Board has argued, and my brethren have agreed, that such a brief delay from the benefits of returning to racial segregation is so egregious as to warrant the issuance of the instant extraordinary writ of mandate. All the requisites for issuance of a TRO are satisfied.
 
 
 28
 A. Legal Requirements.
 
 
 29
 Because TROs are not normally appealable, case law does not detail the standards to be applied on review. However, guidance may be gleaned from cases considering the propriety of preliminary injunctions. Since these latter have a far longer duration than TROs and therefore involve more extensive control of the parties, the standard for their issuance should, if anything, be more rigid than that governing the issuance of TROs. Accordingly, if the district court's order meets the exacting requirements of a preliminary injunction, it follows a fortiori that it is acceptable as a TRO. The order meets the requirements.
 
 
 30
 The decision to issue a preliminary injunction is left to the sound discretion of the district court. Such decision will be reversed only upon a showing of abuse of discretion, applying a "narrow abuse of discretion standard " Miss Universe, Inc. v. Flesher, 605 F.2d 1130, 1133 (9th Cir. 1979).
 
 
 31
 The equitable criteria for granting preliminary injunctive relief are set forth in Los Angeles Memorial Coliseum Com'n v. National Football League, 634 F.2d 1197, 1201 (9th Cir. 1980). A moving party may meet his burden of proving these criteria
 
 
 32
 by demonstrating either (1) a combination of (a) probable success on the merits and (b) the possibility of irreparable injury or (2) that (a) serious questions are raised and (b) the balance of hardships tips sharply in its favor.
 
 
 33
 Id. at 1201; Miss Universe, Inc. v. Flesher, supra, at 1134. See Brown v. Chote, 411 U.S. 452, 456, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420 (1973). In the instant case, plaintiffs can demonstrate both that the balance of hardships tips sharply in their favor and that serious questions are raised.
 
 
 34
 B. Balance of Hardships.
 
 
 35
 The balance of hardship tips sharply in plaintiffs' favor. Busing has been in effect in the Los Angeles City Schools for two and one-half years. The Board is unable to show any serious harm attendant upon that busing. Moreover, there is no reason to believe that an extra ten days' continuation of the policy which has been followed for over two years will prove seriously detrimental to the Board.
 
 
 36
 By contrast, the plaintiffs stand to suffer serious, if not irreparable, harm if busing is immediately halted. The gains which have been painstakingly won over the last eighteen years would be eviscerated overnight, for once ceased, busing would prove very difficult to reinstate.
 
 
 37
 Plaintiffs face a threatened abridgement of their constitutional rights. The Board, by contrast, risks the logistical headache of living with the status quo for an extra ten days. The balance of hardships overwhelmingly tilts towards plaintiffs.
 
 
 38
 C. Serious Question of Success on the Merits.
 
 
 39
 In addition to meeting the first requirement for the issuance of a preliminary injunction, and hence of a TRO, plaintiffs satisfy the second "a serious question" is raised that plaintiffs might ultimately prevail. The majority opinion denies this proposition by holding that Judge Tashima could not have found de jure segregation.
 
 
 40
 It should be emphasized that the majority opinion does not purport to say that plaintiffs cannot ultimately prevail on the merits. The opinion states only that, based on the record then before him, Judge Tashima could not make a finding that plaintiffs were likely to succeed. Thus, even under the majority opinion, plaintiffs are free to continue to prosecute their anti-discrimination case in the district court and to develop a record that will allow them to prevail on the merits, albeit without the benefit of the TRO denied today.
 
 
 41
 In order to succeed on the merits, the plaintiff in a school desegregation case must demonstrate that the School
 
 
 42
 Board's conduct at the time of trial and before not only was animated by an unconstitutional, segregative purpose, but also had current, segregative impact
 
 
 43
 Columbus Board of Education v. Penick, 443 U.S. 449, 455, 99 S.Ct. 2941, 2945, 61 L.Ed.2d 666 (1979) ("Columbus II"). In short, the plaintiff must show discriminatory purpose and a causal relationship between the discriminatory acts and the condition of segregation. Id. at 490-91, 99 S.Ct. at 2953. (Rehnquist, J., dissenting).
 
 
 44
 In order to succeed on their motion for a TRO, plaintiffs herein did not have to prove the above factors; rather, they had to show that these factors present a "serious question." Plaintiffs have done so.
 
 
 45
 1. The Gitelson Opinion.
 
 
 46
 Plaintiffs' primary document establishing the existence of at least a serious question that they will be able to demonstrate the requisite factors for success at trial is Judge Alfred Gitelson's superior court opinion issued in Crawford v. Board of Education, (1970) (unpublished). (The majority opinion disregards this valuable part of the record. See section D, post.) That opinion found that the
 
 
 47
 Board has and is, since at least May of 1963, knowingly, affirmatively and in bad faith, without regard for its legal and fiduciary duties to its pupils, by and through its actual affirmative policies, customs, usages and practice, doings and omissions, segregated, de jure, its students
 
 
 48
 Git.Op. at 24 (italics in original); see id. at 24-25.
 
 
 49
 Beyond this finding of intentional, de jure segregation, Judge Gitelson found that many school policies were undertaken with discriminatory intent and effect. For instance, the Board's placement of new school construction sites was undertaken so that certain schools would have a predominantly white student body while others would be composed almost exclusively of minority students. Git.Op. at 13-15, 18, 24, 29. Such activity constitutes impermissible discrimination. Columbus II, 443 U.S. at 460, 462, 99 S.Ct. at 2948, 2949;[5] Dayton Board of Education v. Brinkman, 443 U.S. 526, 538, 540, 99 S.Ct. 2971, 2979, 2981, 61 L.Ed.2d 720 (1979) ("Dayton II"). Optional attendance zones were created to heighten segregation. Git.Op. at 7, 33. See Dayton II at 540, 99 S.Ct. at 2981; Columbus II at 461, 99 S.Ct. at 2948. School boundaries were drawn and transportation policies set with an eye towards keeping whites separate from minorities in the city schools. Git.Op. at 24-25. Finally, statistics demonstrate a continuing, pervasive pattern of discrimination in the Los Angeles City Schools. See Git.Op. at 17 ("68% of the Mexican-American pupils, 94.8% of the Negro pupils, and 56.8% of the Oriental pupils in the District" attended minority schools); id. at 15-17. Such a pattern is similar to the one which, in Dayton II, "demonstrate(d) convincingly" unconstitutional discrimination. 443 U.S. at 537, 99 S.Ct. at 2979.
 
 
 50
 In all of these examples, Board action " 'intentionally aggravated, rather than alleviated,' racial separation in the schools." Columbus II, 443 U.S. at 461, 99 S.Ct. at 2948. Thus, discrimination was impermissibly brought about by state action. See id. at 464, 99 S.Ct. at 2950. The School Board's action stands in marked contrast to constitutional requirements. Having engaged in de jure discrimination, the Board was obligated to " 'effectuate a transition to a racially nondiscriminatory school system.' " Id. at 458, 99 S.Ct. at 2947. Instead, as demonstrated above, the Board took steps to perpetuate and exacerbate its segregatory policies.
 
 
 51
 2. The March 16 Order.
 
 
 52
 A "serious question" as to whether plaintiffs will be able to demonstrate de jure discrimination at trial is also raised in a manner completely separate from the preceding section. Thus, even if Judge Gitelson's opinion is rejected, the order below should nevertheless be affirmed.
 
 
 53
 In the past two and one-half years, mandatory busing has been used to integrate the Los Angeles City Schools. The Board's March 16 Order, however, sought to eliminate the integration thereby achieved and to return to the former pattern of racial segregation. Such a policy, in and of itself, constitutes de jure discrimination sufficient to activate the equitable power of a federal district judge to issue a temporary restraining order. See Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).
 
 
 54
 Reitman dealt with a period of California history not dissimilar to the time-span here under review. Then, California was enforcing anti-discrimination in housing. Subsequently, an initiative was passed eliminating such enforcement. The Supreme Court held, in light of the "immediate objective," "ultimate effect," and "historical context" prior to its enactment, that the initiative was unconstitutional.
 
 
 55
 In the instant case, the Board's March 16 Order, made possible by California's most recent initiative, Proposition 1, effected a retrenchment from the protection of constitutional guarantees similar to that condemned in Reitman. Its immediate objective was transparently the end of racially integrated schools and a return to "neighborhood," i. e., racially-distinct, schools. Its ultimate effect was to erase all the equal protection gains which the State of California had previously afforded its schoolchildren. And it arose in the "historical context" of a school board which has, for decades, taken all steps necessary to defeat interracial education. Under Reitman, such an action cannot stand.
 
 
 56
 In Dayton Board of Education v. Brinkman, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) ("Dayton I"), the Court found "of questionable validity" the district court's conclusion that the school board in that case had violated Reitman. But Dayton I arose under facts distinguishable from the case at bar. There, the school board had "simply repudiated a resolution of a predecessor Board " Id. at 414, 97 S.Ct. at 2772. Significantly, the Court noted that: "The Board had not acted to undo operative regulations affecting the assignment of pupils , Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) " Id. at 414-15, 97 S.Ct. at 2772-2773. But the action which the Board did not take in Dayton I, and which the Supreme Court implied would violate Reitman, is precisely the subject of this appeal. Accordingly, the Board's Order of March 16, standing alone, furnishes adequate ground to affirm Judge Tashima's conclusion that a serious question as to de jure discrimination was raised.
 
 
 57
 D. The Crawford Court of Appeal Decision Affords No Basis for Collateral Estoppel.
 
 
 58
 The majority opinion holds erroneous Judge Tashima's reliance on the superior court opinion issued by Judge Gitelson in 1970.[6] Its rationale is as follows:
 
 
 59
 Further, it was error as a matter of law for the district court to conclude, solely on the basis of Judge Gitelson's findings, that de jure segregation existed in the past. The California Court of Appeal has determined as a matter of law that Judge Gitelson's findings do not, standing alone, establish de jure segregation.
 
 
 60
 Preliminarily, it should be noted that the majority opinion does not accurately describe the holding below. Judge Tashima did not "conclude, solely on the basis of Judge Gitelson's findings, that de jure segregation existed in the past." Rather, as the preceding sections demonstrate, he issued the TRO on two bases. First, using Judge Gitelson's findings as evidence and weighing it against the evidence contained in the California court of appeal case, Judge Tashima found that there was a serious question as to whether de jure discrimination had existed in the past he did not make the ultimate conclusion that plaintiffs were entitled to prevail in the lawsuit, since such a conclusion was not needed at the TRO stage. Second, Judge Tashima independently grounded his order in the de jure discrimination engaged in by the Board through its March 16 Order an issue on which the majority opinion is mute.
 
 
 61
 While the majority opinion does not invoke collateral estoppel by name, no other doctrine could underlie its decision to reject Judge Gitelson's findings.[7] Collateral estoppel, however, is inapplicable.
 
 
 62
 1. The Crawford Opinion Considered Judge Gitelson's Opinion Only Tangentially.
 
 
 63
 The Crawford plaintiffs originally claimed de jure discrimination. The superior court agreed with them and made such a finding in 1970. That decision was affirmed by the California Supreme Court, which refused, however, to base its decision on a distinction between de facto and de jure segregation.
 
 
 64
 Ten years later, Judge Egly of the Los Angeles Superior Court issued two orders based upon the judgment originally entered in 1970. The Board appealed those two orders in Crawford v. Board of Education, 113 Cal.App.3d 633, 170 Cal.Rptr. 495 (1980). Its appeal was successful, the California district court of appeal holding that the superior court did not have adequate cause to issue the orders. Adequate cause was found lacking because the 1980 decision relied upon the 1970 findings, and the court of appeal found the 1970 findings unreliable.
 
 
 65
 The 1980 appeal was solely from two 1980 orders; it was not from Judge Gitelson's 1970 judgment. In the course of that appeal, it is true, the court commented extensively on the 1970 findings, as these were relied upon in the 1980 orders. Those 1980 orders have now been vacated. The earlier 1970 findings, by contrast, still stand, although their persuasive value has perhaps been undermined by the 1980 court of appeal criticism. From the standpoint of collateral estoppel, however, there has been no diminution in the authority of Judge Gitelson's opinion.
 
 
 66
 Insofar as the court of appeal directly addressed Judge Gitelson's findings, it did so in the context of reviewing a lower court's order in the course of which it commented on a third court's findings. This the court of appeal was entirely free to do. But likewise Judge Tashima was entirely free to draw his own characterizations of a third court's findings. The fact that he reached different conclusions than did the California court of appeal does not impugn his findings.
 
 
 67
 2. Collateral Estoppel Cannot Apply Because the Parties Are Different.
 
 
 68
 Even if the court of appeal opinion is granted collateral estoppel force, it cannot be used against the instant plaintiffs who were not parties to that action. This court's most recent canvassing of the law of collateral estoppel appears in Hinkle Northwest, Inc. v. Securities & Exchange Com'n, 641 F.2d 1304, 1308-1310 (9th Cir. 1981). We stated there that "the fact that the party against which estoppel is urged was not involved in the previous case raises grave problems." Id. at 1309.
 
 
 69
 In the instant case, the majority imposes on the district court the obligation to apply collateral estoppel against plaintiffs who, on the record before us, were never affiliated with any of the state court actions. Without any discussion of the "grave problems" which such a course raises, the majority binds plaintiffs to a conclusion reached against different plaintiffs in a different case. I cannot subscribe to such an unarticulated extension of the boundaries of collateral estoppel to defeat the interests of the schoolchildren of Los Angeles.
 
 
 70
 3. Plaintiffs Cannot Be Collaterally Estopped by a Ten Year Old Case in a Changing Area of Law.
 
 
 71
 An additional reason for refusing to import collateral estoppel from the California court of appeal opinion in Crawford is that the law has changed greatly in desegregation cases since the time of Judge Gitelson's findings. Judge Gitelson found de jure discrimination based on the relevant factors applicable at the time of his writing. But, as the court of appeal notes after extensively reviewing the progression in desegregation law over the intervening ten years, "the trial court made these deductions and inferences in 1970 at a time it did not have the benefit of the more recent decisions of the United States Supreme Court." 113 Cal.App.3d at 644, 170 Cal.Rptr. at 495.
 
 
 72
 Collateral estoppel may not be applied in situations in which intervening modifications in the law create a new legal climate. Jackson v. DeSoto Parish School Board, 585 F.2d 726, 729 (5th Cir. 1978); Estate of Hedrick v. Commissioner of Internal Revenue, 406 F.2d 587, 589 (9th Cir. 1969). Likewise, in the instant situation, the federal courts should not draw excessive conclusions from a state court's determination, in a tangled procedural posture, that 1980-style de jure discrimination was not proved at a 1970 trial. The holding of the California court of appeal that sufficient de jure discrimination was not demonstrated for the purpose of 1980 orders by reference to a 1970 opinion may be sound enough; it in no way implies, however, that 1980 plaintiffs would be unable to prove 1980-style de jure discrimination. A more reasonable conclusion from reading the entire progression of Crawford cases is that Crawford proved de jure discrimination in 1970, and the plaintiffs here could very likely do so again in 1980, although the 1970 findings alone are insufficient for that purpose. Judge Tashima, however, was free to consider those 1970 findings as evidence, albeit inconclusive, of de jure discrimination. Since such evidence is all that is required for issuance of a TRO, the court below acted properly.
 
 
 73
 For the foregoing reasons, Judge Tashima's issuance of the TRO here under review should be affirmed.III. ABSTENTION[8]
 
 
 74
 During the last decade, the Supreme Court has rendered decisions systematically displacing the federal courts from their position as "the primary and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States." Huffman v. Pursue, Ltd., 420 U.S. 592, 617, 95 S.Ct. 1200, 1214, 43 L.Ed.2d 482 (1975) (Brennan, J., dissenting) quoting Steffel v. Thompson, 415 U.S. 452, 464, 94 S.Ct. 1209, 1218, 39 L.Ed.2d 505 (1974) (emphasis in original). Nonetheless, on the facts of this appeal, no Supreme Court decision requires that the NAACP be denied immediate access to its chosen forum, the federal courts. Further, even assuming, arguendo, that abstention is required on the facts of this case, considerations of equity and fairness would nevertheless require that the TRO remain in place.
 
 
 75
 The only matter relevant to this case presently before the state courts is a petition for an extraordinary writ brought by different plaintiffs.[9] Even if the federal plaintiffs were identical to the state plaintiffs, abstention would be improper. The error is compounded by the fact that the federal complainants are being denied a forum solely because different individuals have presented a request for a writ to the state's high court.
 
 
 76
 A. Supreme Court Precedent.
 
 
 77
 1. Abstention for Resolution of State Law Issues.
 
 
 78
 Abstention is warranted in two situations. The first is when a federal district court is called upon to determine the federal constitutional validity of a state statute which the state courts have not yet had an opportunity to construe. See Zwickler v. Koota, 389 U.S. 241, 255-56, 88 S.Ct. 391, 399, 19 L.Ed.2d 444 (1967) (Harlan, J., concurring). Abstention is required in that situation because, given an opportunity to construe the statute, the state courts might construe it in a manner that would "avoid or modify the necessity of reaching a federal constitutional question." Kusper v. Pontikes, 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). By withholding jurisdiction, the federal court is able "to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." Babbitt v. United Farm Workers National Union, 442 U.S. 289, 306, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979), quoting Harman v. Forssenius, 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965).
 
 
 79
 The majority cannot rely on this form of abstention in denying the NAACP immediate access to a federal forum. The request for the temporary restraining order was granted below solely on the basis of federal constitutional considerations. No unresolved state law issues are implicated. Moreover, Proposition 1, which has been sustained by the California courts, insures that any undetermined issues remaining even in the state courts relate solely to federal constitutional law.[10]
 
 
 80
 2. Abstention to Avoid Interference with State Judicial Proceedings.
 
 
 81
 The second situation warranting abstention arises when direct federal court involvement in state judicial proceedings threatens to undermine principles of comity and federalism. See Zwickler, supra, 389 U.S. at 255-256, 88 S.Ct. at 399. Thus, in Huffman v. Pursue, Ltd., supra, relied upon by the majority, the Supreme Court held that the district court erred in partially enjoining implementation of a state trial court's order.
 
 
 82
 The decision in Huffman was premised on four considerations. First, the court noted the equity court's traditional reluctance to enjoin state criminal proceedings. It likened the case before it to a criminal case, noting that the state plaintiff was seeking to enforce a prohibition against obscene materials, a state interest closely related to penal concerns. Second, the Court was concerned that federal intervention could prevent the state from effectuating its substantive policies. Huffman, supra, 420 U.S. at 604, 608, 95 S.Ct. at 1208, 1210. See Moore v. Sims, 442 U.S. 415, 429, 99 S.Ct. 2371, 2380, 60 L.Ed.2d 994 (1979). Third, the Court noted that the district court order undermined the state judiciary's function of providing a forum competent to vindicate federal constitutional objections interposed against state policies. Huffman, supra, 420 U.S. at 604, 95 S.Ct. at 1208. See Moore, supra, at 430, 99 S.Ct. at 2380. Finally, the Court reasoned that the contemporaneous federal proceedings reflected negatively on the state court's ability to enforce federal constitutional principles. Huffman, supra, 420 U.S. at 604, 608, 95 S.Ct. at 1208, 1210. See Moore, supra, 442 U.S. at 430, 99 S.Ct. at 2380.
 
 
 83
 Because the procedural posture of the present case differs from that of Huffman, application of Huffman's concerns to the present facts proves abstention unwarranted. The plaintiffs in Huffman sought direct federal court intervention in state court proceedings. The NAACP, by contrast, seeks only the adjudication of federal rights in an action independent of any state court proceeding.
 
 
 84
 Huffman's initial rationale, equity's traditional reluctance to enjoin criminal proceedings, is obviously inapplicable to the instant case. Although the Supreme Court recently indicated that this factor is no longer a necessary element for finding that the existence of ongoing state proceedings requires federal abstention, Moore, supra, 442 U.S. at 423, 99 S.Ct. at 2377; Juidice v. Vail, 430 U.S. 327, 333-335, 97 S.Ct. 1211, 1216-1217, 51 L.Ed.2d 376 (1976), its statements thus far do not indicate that it would require abstention in the instant case.
 
 
 85
 Moore, the most recent case in this progression, cited Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), and Juidice v. Vail, supra, as examples of abstention invoked in deference to ongoing state civil proceedings. Both cases involved state concerns closely analogous to penal interests. In Trainor, plaintiffs alleging a violation of federal constitutional rights sought to enjoin the state's civil action for recovery of welfare payments allegedly obtained through fraud. Although the alleged acts of the plaintiff were violations of Illinois criminal law, the state proceeded civilly and sought only return of the money. Id. at 435, 97 S.Ct. at 1913. In Juidice, plaintiffs who had been jailed and fined pursuant to New York's contempt procedures sought to enjoin use of those procedures. Although Juidice expressly refused to ground its decision on a finding that contempt proceedings are criminal or quasi-criminal in nature, 430 U.S. at 335, 97 S.Ct. at 1217, the analogy is obvious.
 
 
 86
 The ongoing state civil proceedings in Trainor and Juidice fall within that area marked off in Huffman as requiring abstention. As the ongoing state civil case considered here is well outside that demarcation, nothing in the Supreme Court's recent recharacterization of Huffman abstention indicates that abstention should have been invoked in the instant case. However, even if this assessment were incorrect, application of Huffman's remaining three factors illustrates that the majority's conclusion that the district court must abstain would, nonetheless, remain erroneous.
 
 
 87
 Huffman's second concern, the impact of federal intervention on the state's ability to effectuate its policies, is not implicated here. At the time the district court instituted its order, forty days remained in the school semester. Busing had been in place for two and one-half years. The TRO would have delayed the Board's immediate dismantling of the busing program for only ten days. It is difficult to comprehend how this delay could frustrate a substantive policy of the state.
 
 
 88
 The third concern, preservation of the state judiciary's function of providing a forum competent to adjudicate constitutional objections to state policy, is also not at issue. The TRO would have expired of its own force within ten days. Nothing in Judge Tashima's order limited the prerogatives open to California's courts. Had the state supreme court determined that busing should continue, it would have been free to so order. Conversely, had it determined that busing was no longer an appropriate remedy, it would have been free to rule in accordance with that determination. Thus, the TRO here under review in no way infringed the state courts' role as arbiter of constitutional issues raised in connection with the effectuation of state policy.
 
 
 89
 The final Huffman concern, that concurrent state and federal proceedings might case aspersions upon the state judiciary's willingness and ability to protect federal constitutional rights, is also not implicated by the instant suit. Because the TRO did not usurp the jurisdiction of the state courts, it could not have been a source of negative inference concerning the state judiciary. This action was instituted by parties independent of and distinct from the state court plaintiffs. Judge Tashima's willingness to entertain it proclaims that the federal courts have yet to close their doors to individuals alleging abridgment of fundamental federal constitutional rights. That willingness connotes no disparagement of the state judiciary.
 
 
 90
 Because the instant action involved neither of the situations in which abstention is required and because the district court's decision to entertain the suit engendered none of the evils the abstention doctrine was fashioned to protect, the federal issues presented fully warranted action by a federal court. However, even assuming that abstention was somehow indicated, the serious impact on plaintiffs of dismantling the busing program, measured against the de minimis administrative inconvenience of continuing two and one-half years of desegregation an additional ten days, clearly militated against my brethren's decision to sanction an immediate end to busing.
 
 
 91
 B. Equitable Concerns.
 
 
 92
 In Catrone v. Massachusetts State Racing Comm'n, 535 F.2d 669 (1st Cir. 1976), the First Circuit held that the district court should have abstained, but nonetheless allowed an injunction to stand pending further proceedings.[11] In Catrone, a racehorse trainer sought to force the operators of a race track to permit him access to their premises. Finding state action coupled with a denial of equal protection and due process, the district court issued an injunction in the plaintiff's favor. The First Circuit, noting "the presence of a substantial unresolved state law question which, if decided, might render moot, or present in a different posture, the federal constitutional issues," held that the district court should have abstained pending state court construction of relevant legislation. Id. at 671.
 
 
 93
 However, invoking equity and fairness, the court permitted the injunction to remain in force pending interpretation of the statute. The court noted that the plaintiff's livelihood was threatened by defendants' action, and balanced that threat against the minimal inconvenience to the race track owners of having to tolerate plaintiff's presence on their premises. It further noted that there was a substantial likelihood that plaintiff had a meritorious federal claim. Taken together, these factors "strongly suggest(ed) the propriety of granting preliminary injunctive relief." Id. at 672.
 
 
 94
 The equities in the instant case present a much more compelling rationale for permitting plaintiffs temporarily to maintain the status quo. Here, we are confronted with the ability of thousands of schoolchildren to remain in integrated schools. The busing program, which today has been so precipitously cast aside, protects the constitutional right of the children of Los Angeles to an equal education in an environment free of the evils of intentional segregation. Once that program has been dismantled, it will be extremely difficult to reconstruct. When balanced against the harm to plaintiffs, the hardship faced by the school board were busing to continue an additional ten days must yield. See part II(B), ante. Further, as previously noted, I believe that Judge Tashima correctly analyzed the legal merit of plaintiffs' case when he concluded that plaintiffs raise a serious issue as to their likely success on the merits. See part II(C), ante. As all the elements are present which compelled the Catrone court to permit an injunction to remain in place although abstention was otherwise warranted, equity and fairness strongly counsel likewise affirming the temporary restraining order in this case.
 
 IV. CONCLUSION
 
 95
 Judge Tashima was well within his jurisdiction and discretion in granting the temporary restraining order. The record justified his conclusion that the balance of harm tilted sharply in plaintiffs' favor and that plaintiffs presented a serious question regarding their ability to demonstrate de jure segregation in Los Angeles.
 
 
 96
 The majority's opinion reaches only the district court's grant of the temporary restraining order on the facts of this record. I am most concerned, however, that the majority opinion might be misconstrued to deprive the district court of jurisdiction over an important federal question, thereby divesting it of a constitutional responsibility. I fear that the opinion's ambiguity might be seized upon as the mechanism through which students in the Los Angeles school system are erroneously deprived of the opportunity to assert federal constitutional rights in federal courts and to have the merits of those rights adjudicated. Such a reading of the case would be contrary to the doctrines of abstention and collateral estoppel articulated in the Supreme Court and Ninth Circuit decisions cited in this dissent. That devastating result would be an inadvertent and unfortunate consequence of a decision limited to the denial of a TRO.
 
 
 97
 I find that Judge Tashima's order was correctly founded on standards governing the issuance of a TRO and that the principles of abstention and collateral estoppel cannot deprive the district court of jurisdiction over this federal question. I would affirm the decision of the lower court.
 
 
 
 [1]
 See note 8, post
 
 
 [2]
 Judge Gitelson found that the Board had "knowingly, affirmatively and in bad faith by and through its affirmative policies and practices, segregated, de jure, its students " Git.Op. at 24. He found intentional segregation in the Board's neighborhood school assignment policy, open transfer policy, feeder school policy, and mandatory attendance areas and boundaries
 
 
 [3]
 Proposition 1 renders federal law controlling of the current litigation:
 Except as may be precluded by the Constitution of the United States, every existing judgment, decree, writ, or other order of a court of this state, whenever rendered, which includes provisions regarding pupil school assignment or pupil transportation, or which requires a plan including any such provisions shall, upon application to a court having jurisdiction by any interested person, be modified to conform to the provisions of this subdivision as amended, as applied to the facts which exist at the time of such modification.
 Cal.Const. Art. I, § 7(a) (1979).
 
 
 [4]
 Subsequent to the filing of the majority order and during the writing of this dissent, the California Supreme Court denied the petition
 
 
 [5]
 In Columbus II, the de jure discrimination necessitating remedial obligations had occurred before the decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The fact that in the instant case the evidence points towards a de jure violation having been committed after, rather than prior, to 1954 in no way lessens the Board's "continuous constitutional obligation to disestablish its dual school system " Columbus II, supra, 443 U.S. at 458, 99 S.Ct. at 2947
 
 
 [6]
 Even if correct on this point, the majority would still lack cause to issue a writ of mandate vacating the TRO. Judge Tashima independently grounded his issuance of the TRO on the factors discussed in part C(2), ante ; as the majority attacks only his reliance on Judge Gitelson's findings, even if their reasoning were sound there would remain valid grounds on which to affirm
 
 
 [7]
 In particular, res judicata is inapplicable to these facts. Res judicata precludes parties from relitigating the same claim; collateral estoppel precludes them from relitigating the same facts. The Crawford case involved the fact of desegregation, but not the claim that the Board's March 16 Order was invalid. Thus, at most, it could serve as collateral estoppel in the instant action, not as res judicata
 
 
 [8]
 This section was drafted in response to the majority's original opinion, which included an additional line from Huffman and an entirely different concluding paragraph:
 "The District Court should not have entertained this action, seeking preappeal interference with a state judicial proceeding, unless appellee established that early intervention was justified under one of the exceptions recognized in Younger." (420 U.S.) at 610-611, 95 S.Ct. at 1211.
 The district court was required to abstain from attempting to resolve federal constitutional questions concerning the March 16, 1981 resolution now pending before the California Supreme Court. It was also required to abstain from determining, contrary to the holding of the California Court of Appeal, that de jure segregation has long existed in the Los Angeles Unified School District. That question might have appropriately been presented by plaintiffs to the United States Supreme Court, and still may be.
 Because the amended opinion intimates that abstention might still be relevant to the disposition of this case, I have included my response to the original disposition.
 
 
 [9]
 That petition is no longer pending. See note 4, ante
 
 
 [10]
 Prior to the enactment of Proposition 1, Justice Rehnquist, in an Opinion in Chambers, issued a decision refusing to stay operation of the Los Angeles desegregation plan. Bustop, Inc. v. Board of Education, 439 U.S. 1380, 99 S.Ct. 40, 58 L.Ed.2d 88 (1978) (Rehnquist, J.). Applicant Bustop, Inc. requested a stay of the desegregation order authorized in Crawford v. Board of Education, 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28 (1976). Because he concluded that "the complaints were about California state law," Justice Rehnquist decided that "it is in the forums of that State that these questions must be resolved." 439 U.S. at 1383, 99 S.Ct. at 41
 Justice Rehnquist's opinion declined jurisdiction solely on the grounds that the state law in question was the only issue in the case. 439 U.S. at 1381, 99 S.Ct. at 40-41. California subsequently adopted Proposition 1 to render California's desegregation law no more rigorous than federal law. Under the operation of the current California constitution, therefore, desegregation in the state raises questions solely of federal law.
 
 
 [11]
 Another example of the same phenomenon occurs in Dayton I, supra. There, the Court held that the desegregation order imposed by the district court was unwarranted. 433 U.S. at 421, 97 S.Ct. at 2776. Nonetheless, the Court commented that the desegregation order had been in effect for "the present year without creating serious problems," id., and accordingly allowed it to remain in effect to avoid disruption, id. See Dayton II, supra, 443 U.S. at 532, 99 S.Ct. at 2976. Such forebearance stands in marked contrast to the majority's precipitous action in the instant case