[L.A. No. 31382. Mar. 22, 1982.]

WALTER T. McKINNY et al., Plaintiffs and Appellants, v.
BOARD OF TRUSTEES OF THE OXNARD UNION HIGH
SCHOOL DISTRICT et al., Defendants and Respondents.

COUNSEL

Hadden, Waldo & Malley, Waldo & Malley, Thomas E. Malley, Herbert D. Nowlin and Richard C. Gilman for Plaintiffs and Appellants.

Nordman, Cormany, Hair & Compton, Larry L. Hines and Glen M. Reiser for Defendants and Respondents.

Thomas M. Griffin as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

MOSK, J.—In 1963, we recognized for the first time the constitutional duty of local school authorities to make an effort to eliminate racial segregation in this state's schools. (*Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878].) We reaffirmed and explained the holding of *Jackson* in *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28]: "[W]e adhere to this court's decision in *Jackson*. In California, all public school districts bear an obligation under the state Constitution to undertake reasonably feasible steps to alleviate school segregation, regardless of the cause of such segregation." (*Id.* at pp. 301-302; see also *National Assn. for Advancement of Colored People* v. *San Bernardino City Unified Sch. Dist.* (1976) 17 Cal.3d 311 [130 Cal.Rptr. 744, 551 P.2d 48].) The present case concerns the procedures local school boards must follow when seeking to comply with the mandate of *Crawford*. ██ We also review the trial court's refusal to enjoin implementation of a desegregation plan adopted by the Oxnard Union High School District in light of the subsequent passage of the "anti-busing" amendment, a 1979 initiative measure amending California Constitution, article I, section 7, subdivision (a).[1]

*Crawford* clarified the situations in which a school board is obligated to desegregate schools within its boundaries and generally outlined the procedures a board must follow in fulfilling its duty to desegregate. The board must first identify those schools which may properly be classified as "segregated schools," i.e., "schools in which the minority student enrollment is so disproportionate as realistically to isolate minority

---

[1] It is the established rule that "on appeals involving injunction decrees, the law in effect when the appellate court renders its opinion must be applied." (*Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 527-528 [45 P.2d 972].)

students from other students and thus deprive minority students of an integrated educational experience.... It is such segregated schools which traditionally have resulted in the inherently unequal educational opportunities condemned in [*Brown* v. *Board of Education* (1954) 347 U.S. 483 (98 L.Ed.2d 873, 74 S.Ct. 686, 38 A.L.R.2d 1180)]." (*Crawford, supra*, at p. 303.) The court emphasized that the primary objective of a desegregation plan is to achieve a uniformity of educational opportunities for all races by eliminating the detrimental effects of a segregated school system, not to precisely correlate the racial composition of each school with that of the district as a whole. "[The] Constitution does not require a school board to achieve a particular or identical 'racial mix' or 'racial balance' in each school; rather, the constitutional evil inheres in the existence of *segregated* schools. It is the elimination of such segregation and the harms inflicted by such segregation that is the ultimate constitutional objective." (*Crawford, supra*, at p. 285; italics in original.)

In determining whether a particular school is segregated, then, the board must consider a number of factors, including these: "the racial composition of its student body[,] ... the racial composition of faculty and administration, and community and school board attitudes toward the school ...." (*Crawford, supra*, at p. 287, fn. 1.) After identifying any segregated schools within its jurisdiction, the board must develop a plan for alleviating the segregation found to exist. In order to encourage public acceptance of the desegregation plan ultimately chosen and to aid informed decisionmaking, the board should give affected community members a meaningful opportunity to participate in the desegregation process from start to finish. (*Crawford, supra*, at p. 286.)

The State Board of Education (BOE) responded to *Crawford* by promulgating regulations designed to implement its constitutional mandate. (Cal. Admin. Code, tit. 5, §§ 90-101.)[2] The BOE Regulations recite *Crawford*'s definition of a segregated school (*id.*, § 92, sub. (d)) and detail several criteria for school boards to employ in applying the defini-

---

[2]The BOE's authority to enact such regulations derives from Education Code section 33031, which provides: "The [BOE] shall adopt rules and regulations not inconsistent with the laws of this state ... (c) for the government of the day and evening elementary schools, the day and evening secondary schools, and the technical and vocational schools of the state ...."

Hereinafter, all references to the "Regulations" or to the "BOE Regulations" refer to California Administrative Code, title 5.

tion to particular schools (*id.*, § 93, subd. (b)). In addition, the Regulations require community involvement in the desegregation process (*id.*, § 96) and a public hearing with one month's notice to "parents of all students enrolled in the district" (*id.*, § 98). The BOE also issued "guidelines" to explain its regulations to local school boards. (Cal. State Bd. of Education, Guidelines: Plans to Alleviate Racial and Ethnic Segregation of Minority Students (Apr. 12, 1978) (Guidelines).)

In attempting to fulfill its duties under *Crawford* and the BOE Regulations, the Oxnard Union High School District (District) conducted statistical surveys of the following characteristics of each of its schools: (1) the racial/ethnic composition of students (as required by Cal. Admin. Code, tit. 5, § 97); (2) the racial/ethnic composition of faculty and staff; (3) the racial/ethnic distribution of student participation in athletics and school-related activities; and (4) the buildings and equipment. In addition, based on nominations from each principal in the District, the Board of Trustees (Board) established a twenty-two-person advisory committee composed of ten parents (three of whom were also teachers), five students, five principals, and two administrators. Eleven of the committee members were from minority groups. The District supplied each member with a workbook containing summaries of the various statistical surveys and general information about the committee's function within the desegregation process—i.e., to identify which high schools appeared to be racially segregated and to suggest to the Board a plan for remedying any segregation found to exist.

The District contains five high schools: Camarillo, Channel Islands, Hueneme, Oxnard, and Rio Mesa. In determining whether any of those schools was segregated, the committee members examined five criteria: "(1) The racial and ethnic composition of each school in the district by numbers and percentages, including changes which have occurred in the racial and ethnic composition of each school in the preceding five years, as compared with such data for the district as a whole . . .; (2) Data on the racial and ethnic composition of the administrative, certificated and classified staff at each school; (3) The attitudes of the community, administration and staff as to whether each school is a 'minority' or 'non-minority' school; (4) The quality of the buildings and equipment; (5) the organization of, and participation in, extracurricular activities." (Cal. Admin. Code, tit. 5, § 93, subd. (b).) The committee members voted on which schools they viewed as segregated according to each of

the five criteria, concluding that Channel Islands and Oxnard High Schools were segregated and that the other three schools were not.[3]

Although primarily directing their attack to the Board's procedure, plaintiffs also appear to challenge the substantive correctness of the determination that Camarillo High School was not segregated. Insofar as they do, we recognize that courts apply a deferential standard of review to such determinations. "School districts are agencies of the state for the local operation of the state school system." (*Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 181 [302 P.2d 574].) As we explain below, the development of a desegregation plan is a quasi-legislative function. ■
"It is established that in reviewing quasi-legislative actions of administrative agencies the scope of judicial review is limited to an examination of the proceeding before the agency to determine whether its actions have been arbitrary, capricious or entirely lacking evidentiary support, or whether it has failed to follow the procedure or give the notices required by law." (*County of Orange* v. *Heim* (1973) 30 Cal.App.3d 694, 719 [106 Cal.Rptr. 825]; see also *California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 211-212 [157 Cal.Rptr. 840, 599 P.2d 31]; *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833-835 [27 Cal.Rptr. 19, 377 P.2d 83]; *Ray* v. *Parker* (1940) 15 Cal.2d 275, 303-312 [101 P.2d 665].) A corollary to the rule is that an administrative agency exercising a quasi-legislative function is not required to make detailed findings of fact. (*Ensign Bickford Realty Corp.* v. *City Council* (1977) 68 Cal.App.3d 467, 473 [137 Cal.Rptr. 304]; cf. *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 513-518 [113 Cal.Rptr. 836, 522 P.2d 12].)

---

[3]The committee recorded the results of its vote on a "scorecard":

| | Hueneme | | Camarillo | | Channel Is. | | Rio Mesa | | Oxnard | |
|---|---|---|---|---|---|---|---|---|---|---|
| Criteria | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1 | 0 | 17 | 11 | 6 | 16 | 1 | 1 | 16 | 11 | 6 |
| 2 | 4 | 13 | 2 | 15 | 4 | 13 | 4 | 13 | 2 | 15 |
| 3 | 2 | 15 | 4 | 13 | 14 | 3 | 0 | 17 | 14 | 3 |
| 4 | 0 | 17 | 1 | 16 | 1 | 16 | 0 | 17 | 0 | 17 |
| 5 | 1 | 16 | 1 | 16 | 3 | 14 | 0 | 17 | 1 | 16 |

Channel Islands and Oxnard High Schools, which the committee found to be segregated, received majority "segregated" votes in two categories: (1) student body composition; and (2) community, administration, and staff attitudes. Hueneme and Rio Mesa High Schools, which the committee found to be nonsegregated, received no majority "segregated" votes in any category. Camarillo High School received a majority "segregated" vote in the racial composition category, yet was found to be nonsegregated.

■ The main basis for plaintiffs' contention that the Board acted arbitrarily in determining that Camarillo High School was not segregated is the District's student racial composition survey, which reveals that Camarillo High School was approximately 86 percent white and 14 percent minority in 1979. However, "from a constitutional standpoint, we see nothing inherently invalid in the fact that percentages of various racial or ethnic groups may vary, even significantly, in different schools throughout a school district, or even that a particular minority group may be completely unrepresented in a particular school." (*Crawford, supra*, at p. 304.) The Board could rationally have concluded, based on the advisory committee members' perception that Camarillo High School was not segregated, that the admittedly substantial disparity between minority and white racial percentages at Camarillo High School was not "so disproportionate as realistically to isolate minority students from other students in the district." (*Ibid.*) We conclude that the Board's determination was not "arbitrary, capricious or lacking evidentiary support."

The committee next reviewed four staff-prepared proposals for the alleviation of segregation in the District. It voted to recommend proposal III, which called for changes in the boundary lines of the attendance zones for four of the five schools. Minority group representation would be increased and white representation decreased at Channel Islands and Oxnard High Schools; the opposite effect would occur at Hueneme and Rio Mesa High Schools.[4] Proposal III did not affect Camarillo High School. The advisory committee later reviewed three alternative proposals submitted by plaintiff McKinny, but reaffirmed its decision to recommend proposal III.

[4]The statistical effect of proposal III was to be as follows:

| School | '79-'80 Student Racial Composition Data (NO PLAN) | | '79-'80 Student Racial Composition Data (PROPOSAL III) | | '82-'83 Student Racial Composition Data (PROPOSAL III) | |
|---|---|---|---|---|---|---|
| | % of M/S* | % of W/S† | % of M/S | % of W/S | % of M/S | % of W/S |
| Camarillo | 14.08 | 85.92 | 13.43 | 86.57 | 13.43 | 86.57 |
| Hueneme | 47.78 | 52.22 | 50.79 | 49.21 | 54.00 | 45.99 |
| Rio Mesa | 35.42 | 64.58 | 38.49 | 61.51 | 47.74 | 52.25 |
| Channel Islands | 66.79 | 33.21 | 65.88 | 34.11 | 62.17 | 37.82 |
| Oxnard | 60.26 | 39.74 | 58.96 | 41.04 | 54.07 | 45.92 |

*Minority Students—†White Students

During the committee's tenure, the Board supervised its progress and considered, then adopted, each of its recommendations. After selecting proposal III, the Board scheduled a public hearing, notifying the public by publication in local newspapers and by mail to the parents of all students then attending high schools within the District. At the hearing, the Board confirmed its findings of segregation and affirmed its selection of proposal III to remedy the situation. Proposal III went into effect in September 1979.

The present action originated before the public hearing. Plaintiffs[5] sought a temporary restraining order to block the public hearing and an injunction to prevent implementation of proposal III. They raised three primary contentions: (1) that the Board incorrectly arrived at its determination as to which schools were segregated because it did not adopt specific, numerical criteria to define segregation (Cal. Admin. Code, tit. 5, § 93, subd. (b)(1)) and because it failed to adequately assess community attitudes regarding which schools were segregated (*id.*, § 93, subd. (b)(3)); (2) that the Board did not comply with the notice requirements of section 98, subdivisions (a) and (b)(1) of the Regulations; and (3) that the Board violated section 96 of the Regulations by not giving the public sufficient opportunity to participate in the desegregation process. The trial court, finding that the Board had fully complied with the procedures delineated in the Regulations and Guidelines, refused to grant any injunctive relief. This appeal ensued.

## I.

■ Defendants contend that plaintiffs do not have standing to maintain this action. Although this argument was not raised in the trial court, it is properly before us. ■ It is elementary that a plaintiff who lacks standing cannot state a valid cause of action; therefore, a contention based on a plaintiff's lack of standing cannot be waived under Code of Civil Procedure section 430.80 and may be raised at any time in the proceeding. (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 619 [156 Cal.Rptr. 718, 596 P.2d 1134]; *Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6].)

---

[5]Plaintiff Walter T. McKinny is the parent of a student who was attending an Oxnard Union High School District school at the time suit was filed. Nadine Bautista and Anne Lewis are parents of students who were preenrolled, incoming ninth-graders. Jim Ulmer is a taxpayer in the District, as are the other plaintiffs.

*Tinsley* v. *Palo Alto Unified School Dist.* (1979) 91 Cal.App. 3d 871 [154 Cal.Rptr. 591], cited by defendants, is inapposite. With respect to the standing issue, it held merely that parents wishing to sue to protect their children's right to equal educational opportunities must join the affected children as plaintiffs. (*Id.* at pp. 882-889.) Here, the parents did not sue on their children's behalf, but rather asserted standing as taxpayers under Code of Civil Procedure section 526a.[6] ██ "The primary purpose of [§ 526a], originally enacted in 1909, is to 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.' [Citation.] [¶] California courts have consistently construed section 526a liberally to achieve this remedial purpose." (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-268 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) In *Los Altos Property Owners Assn.* v. *Hutcheon* (1977) 69 Cal.App.3d 22, 26-30 [137 Cal.Rptr. 775], the court held that taxpayers may sue under section 526a to enjoin illegal or wasteful expenditures of public funds by local school districts. ██ On these facts, the development and implementation of the desegregation plan by the Board undoubtedly required an expenditure of public funds. It follows that plaintiffs have standing as taxpayers to challenge the legality of the school district's actions herein.

## II.

After entry of judgment in this action, the voters amended California's equal protection clause by adopting a measure known as Proposition 1, which provides in part: "In enforcing [the state equal protection clause] or any other provision of this Constitution, no court of this state may impose upon the State of California or any public entity, board, or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution, and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection

---

[6]Section 526a provides: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the State, may be maintained ... by a citizen resident therein ... who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."

Clause of the 14th Amendment of the United States Constitution."
(Cal. Const., art. I, § 7, subd. (a).)[7]

■ As a preliminary matter, we consider to what extent this amendment affected our decision in *Crawford*, which reaffirmed the judicially enforceable obligation of local school boards to attempt to remedy segregation in schools, whether or not caused by actions of the board. (*Crawford, supra,* at pp. 301-302.) Federal decisions, in contrast, require a showing of intentionally discriminatory acts contributing to a present pattern of segregation before a school board can be required to take steps to desegregate its schools: "[P]laintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." (*Keyes* v. *School District No. 1, Denver, Colo.* (1973) 413 U.S. 189, 198 [37 L.Ed.2d 548, 557, 93 S.Ct. 2686].) Racial segregation in schools "is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions." (*Dayton Board of Education* v. *Brinkman* (*Dayton I*) (1977) 433 U.S. 406, 413 [53 L.Ed.2d 851, 859, 97 S.Ct. 2766]; see also *Dayton Board of Education* v. *Brinkman* (*Dayton II*) (1979) 443 U.S. 526 [61 L.Ed.2d 720, 99 S.Ct. 2971]; *Columbus Board of Education* v. *Penick* (1979) 443 U.S. 449, 464-465 [61 L.Ed.2d 666, 680-681, 99 S.Ct. 2941]; see generally *Arlington Heights* v. *Metropolitan Housing Corp.* (1977) 429 U.S. 252, 264-265 [50 L.Ed.2d 450, 463-464, 97 S.Ct. 555]; *Washington* v. *Davis* (1976) 426 U.S. 229, 239 [48 L.Ed.2d 597, 607, 96 S.Ct. 2040].)

Proposition 1 conforms a school board's obligations with respect to "pupil school assignment" and "pupil transportation" to those duties imposed by the federal equal protection clause; it prohibits California courts from ordering changes in "pupil school assignment" or "pupil transportation" unless there has been a federal constitutional violation and federal case law would permit such a remedy. However, the amendment neither releases school districts from their state constitutional obligation to take reasonably feasible steps to alleviate segregation regardless of its cause, nor divests California courts of authority to order

---

[7]We note that the United States Supreme Court is currently considering whether Proposition 1 violates the Fourteenth Amendment. (*Crawford* v. *Board of Education* (*Crawford II*) (1980) 113 Cal.App.3d 633 [170 Cal.Rptr. 495], cert. granted (1981) 454 U.S. 892 [70 L.Ed.2d 206, 102 S.Ct. 386].) Thus we do not consider that issue in this proceeding. Since the matter was not briefed or argued, for this case only we proceed by assuming the constitutionality under the federal Constitution of this state constitutional amendment.

desegregation measures other than pupil school assignment or pupil transportation. (*Crawford* v. *Board of Education* (*Crawford II*) (1980) *supra*, 113 Cal.App.3d 633, 636-637, 651-652, cert. granted on a different issue, 454 U.S. 892 [70 L.Ed.2d 206, 102 S.Ct. 386].) When a school district fails to fulfill its state constitutional obligations, we retain our power to compel, for example, school closure, school site selection, creation of special "magnet schools," curriculum changes, or other steps to overcome the adverse effects of school segregation.[8]

## III.

Because there has been no contention in this action that the Oxnard school authorities at any time committed intentional acts contributing to the present pattern of segregation in the District, federal courts would not impose on the Board a requirement to desegregate. Thus we could not now order the District to alter its attendance zones for the purpose of modifying the racial balance in its schools. Nevertheless, the Board possesses the authority to change attendance zones voluntarily. (Ed. Code, § 35014; *Crawford, supra*, at p. 294; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 951-952 [92 Cal.Rptr. 309, 479 P.2d 669]; see generally *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 336-338 [118 Cal.Rptr. 637, 530 P.2d 605].) Proposition 1 expressly refrained from interfering with the power of school boards to voluntarily implement any desegregation measures they might choose: "Nothing herein shall prohibit the governing board of a school district from voluntarily continuing or commencing a school integration plan after the effective date of this subdivision as amended." (Cal. Const., art. I, § 7, subd. (a), 4th par.)

Nevertheless, it is abundantly clear that in voluntarily implementing desegregation measures, the Board must adhere to applicable BOE Regulations and case law. We turn now to the central issue in the present case—whether the Board complied with the requirements of *Crawford* and the responsive Regulations of the BOE in developing its program for alleviating segregation in the Oxnard Union High School District. In reviewing the correctness of the Board's action, we keep in mind the broad purpose of *Crawford*, i.e., to achieve equality of educational opportunities for school children in California, whatever their race or

---

[8]We intimate no view as to which of the many administrative techniques available to facilitate desegregation fall within the meaning of "pupil school assignment" under Proposition 1.

ethnicity. We recognized in *Crawford* that this goal is most likely to be reached through the voluntary efforts of local school authorities working cooperatively with affected community members. Local boards are better equipped than are courts to fashion workable, effective desegregation plans tailored to the specific characteristics of each school district—including the nature and extent of segregation present, the financial resources of the district, local geography, and a myriad of other variables. In addition, local boards are better able to achieve public acceptance of their desegregation efforts.

For the foregoing reasons, *Crawford* structured a limited role for the courts in overseeing the desegregation process: "[S]o long as a local school board initiates and implements reasonably feasible steps to alleviate school segregation in its district, and so long as such steps produce meaningful progress in the alleviation of such segregation, and its harmful consequences,[9] we do not believe the judiciary should intervene in the desegregation process. Under such circumstances, a court thus should not step in even if it believes that alternative desegregation techniques may produce more rapid desegregation in the school district. . . . In our view, reliance on the judgment of local school boards in choosing between alternative desegregation strategies holds society's best hope for the formulation and implementation of desegregation plans which will actually achieve the ultimate constitutional objective of providing minority students with the equal opportunities potentially available from an integrated education." (*Crawford, supra,* at pp. 305-306.) We examine the actions of the Board in light of the above principles.

## A. *Segregation Determinations*

■ Plaintiffs challenge the Board's determinations as to which of its five schools were segregated; they argue that the Board erred in refusing to adopt sufficiently specific criteria to guide its determinations, and that the Board did not properly consider community attitudes towards the character of the schools. We address these contentions in order.

---

[9]We have no occasion to decide whether proposal III promises to achieve "meaningful progress" towards the elimination of segregation in the District. Plaintiffs failed to challenge the substantive adequacy of proposal III in the trial court, and are therefore foreclosed from doing so for the first time on appeal. (See, e.g., *Everly Enterprises, Inc.* v. *Altman* (1960) 54 Cal.2d 761, 765-766 [8 Cal.Rptr. 455, 356 P.2d 199]; *Damiani* v. *Albert* (1957) 48 Cal.2d 15, 18 [306 P.2d 780].)

In making its segregation determinations, the Board relied exclusively on the five criteria listed in section 93, subdivision (b), of the BOE Regulations. (See also *Crawford, supra,* at p. 304.) Both the Regulations and the Guidelines recommend that a school board adopt numerical criteria for determining which schools are segregated. The Regulations provide: "The governing board may determine that a school is segregated when the minority composition of such school exceeds a specified percentage, exceeds a specified percentage in excess of the percentage of that minority in the district, or may utilize other criteria." (Cal. Admin. Code, tit. 5, § 93, subd. (b)(1); see also Guidelines, *op. cit. supra,* ch. 6, p. 10.) The provisions of the Guidelines and Regulations are worded in permissive, not mandatory, language; the Board was not required to adopt specific criteria. Indeed, *Crawford* recognized that courts should not mandate the use of fixed mathematical formulae based solely upon student racial composition to determine whether segregation exists: "[I]n determining whether a particular school is 'segregated' for constitutional purposes, we do not believe set racial or ethnic percentages can be established, either in absolute terms or in terms of the racial composition of a particular district's student population. Under the California Constitution, as under the federal Constitution, '[w]hat is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff[,] and the community and administration attitudes toward the school, must be taken into consideration.'" (*Crawford, supra,* at pp. 303-304, quoting *Keyes* v. *School District No. 1* (1973) 413 U.S. 189, 196 [37 L.Ed.2d 548, 556, 93 S.Ct. 2686].) In *Crawford* we overturned the trial court's definition of segregation because it was based solely on racial percentages of students in particular schools. (*Crawford, supra,* at p. 302, fn. 12.)

Although racial imbalance of students may be the primary indicator of segregation, it is not the only element to be considered; local boards are obligated to weigh a number of factors in determining the existence of segregation. To the extent that the Regulations suggest that it is appropriate for school boards to formulate per se, mathematical rules for defining segregation—relying solely on racial composition data—they are inconsistent with *Crawford* and are hereby disapproved.

One criterion that school boards must consider in determining which schools are segregated is "[t]he attitudes of the community, administra-

tion and staff as to whether each school is a 'minority' or 'non-minority' school." (Cal. Admin. Code, tit. 5, § 93, subd. (b)(3).) Plaintiffs assert that the Board failed to develop enough data to adequately assess "community attitudes." We disagree. Representatives of the District surveyed the advisory committee members regarding their attitudes towards which schools were segregated. The committee—composed of parents, principals, students, and administrators—did not perceive Camarillo, Hueneme, or Rio Mesa High Schools to be segregated; they did, however, perceive Channel Islands and Oxnard High Schools to be segregated. It would have been preferable had the District undertaken a limited statistical survey of attitudes among students, staff, and parents to get a clear picture of community perceptions; but neither the BOE Regulations nor the California Constitution requires such a poll. We decline the plaintiffs' suggestion to burden financially pressed school districts by compelling them to conduct district-wide community opinion polls.

### B. *Community Involvement*

We next consider whether the Board allowed sufficient opportunity for informed community involvement in the process of determining the existence of segregation within the District and in selecting a desegregation strategy. *Crawford* plainly recognized the need for community participation: "In the absence of an easy, uniform solution to the desegregation problem, plans developed and implemented by local school boards, working with community leaders and affected citizens, hold the most promising hope for the attainment of integrated public schools in our state." (*Crawford, supra*, at p. 286.) The BOE Regulations expressly require such participation: "Governing boards shall involve parents, teachers, students and other community representatives in all stages of identifying the need for a plan under Section 93 and in the development and implementation of such plans under Section 94." (Cal. Admin. Code, tit. 5, § 96.) The Guidelines recommend techniques for achieving public input: "The board should seriously consider the form in which community participation may most effectively be utilized. This should include the establishment of a special advisory committee at the district, area, or school site levels. When such committees are established, the board should take care to make certain that it is composed of parents, teachers, administrators, students, and other community representatives and is composed of a substantial percentage of minority group persons." (Guidelines, *op. cit. supra*, ch. 5, p. 7.)

## 1. *Development of desegregation proposals.*

At the April 30, 1979, meeting of the advisory committee, the District presented four staff-prepared desegregation proposals, none of which would have affected Camarillo High School. These four proposals suggested desegregation techniques ranging from compulsory busing to open enrollment to changes in boundary lines of student attendance zones. The committee voted to recommend proposal III, which called for boundary-line changes to decrease minority enrollment at Channel Islands and Oxnard High Schools. Minority enrollment at Hueneme and Rio Mesa High Schools was to be increased. When the committee presented its recommendation to the Board at its May 9th meeting, "[t]here was extensive discussion on the boundary line changes as recommended by the Committee." (Official minutes of the May 9, 1979, meeting of the Oxnard Union High School District Board of Trustees.) The Board decided to schedule another advisory committee meeting to "provide interested people ample time to develop alternative plans and discuss [them] with Committee Members." (*Ibid.*) On May 16, "Mr. W. McKinney [*sic*] presented three new proposals [to the committee] . . . Proposal 5 would return the high school district to status quo indicating that there is no imbalance; Proposal 6 involves busing equal numbers of freshmen between Camarillo and Channel Islands high schools; Proposal 7 involves [extensive reassignment and busing of students among Camarillo, Channel Islands, and Rio Mesa High Schools]. . . . A half hour was devoted to input from the audience with a wide variety of ideas and opinions from the public addressing this matter." (Minutes of the May 16, 1979, Meeting of the Advisory Committee to Consider Racial & Ethnic Balance in the District.) The committee voted to reject the three alternative proposals and to reaffirm its selection of proposal III. The Board again considered the advisory committee's recommendations at its next meeting, on May 23. "After extensive discussion of this matter by interested persons, staff, and the Board," the Board adopted proposal III. (Official minutes of the May 23, 1979, Meeting of the Oxnard Union High School Board of Trustees.) The Board reviewed and reaffirmed its decision at a public hearing on June 26.

Despite this record, plaintiffs claim that the Board did not allow enough public involvement in the development of its desegregation plan. This contention is without merit. Although the District's staff prepared the four original proposals without input from the public, the citizens' advisory committee members had an opportunity to and actually did develop three alternative proposals. That none of those alternative

proposals was ultimately adopted by the Board is of no moment. What is significant is that the advisory committee and the Board were presented with a fair range of proposals supported by accurate, objectively developed data. Because of the diverse composition of the advisory committee, a range of community views was expressed each time it met. Additionally, members of the public expressed their views directly to the committee and to the Board on numerous occasions. The facts therefore demonstrate ample community participation in the desegregation process.

### 2. *The public hearing: scope of notice.*

Before holding the public hearing of June 26, 1979, the District published a notice thereof in local newspapers and mailed a notice to the parents of all high school students in the District. Two of the plaintiffs are parents of children who were attending eighth grade at the time of the hearing, but were planning to attend District high schools the following fall. These parents assert that due process principles and the BOE Regulations require that notice of a hearing on a proposed desegregation plan be sent to all "interested" community members. Since they did not receive notice of the hearing, they argue, we must overturn the District's desegregation plan.

With respect to the contention that plaintiffs possess a procedural due process right to notice by mail of such hearings, we note that a local school board's adoption of a desegregation plan is undeniably a quasi-legislative function. Because it affects the community within the District's boundaries in a generalized manner it is much like adoption of a general zoning ordinance, which we recently classified as a quasi-legislative action: "[I]t is black letter constitutional law that due process requires 'notice and hearing' only in quasi-judicial or adjudicatory settings and not with respect to the adoption of general legislation. . . . [T]he decisions applying the due process requirements of notice and hearing have all involved governmental decisionmaking in an *adjudicative* setting, in which the government's action affecting an individual was determined by facts peculiar to the individual case; the present matter, by contrast, involves the adoption of a broad, generally applicable, *legislative* rule." (Fn. omitted.) (*San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 211, 212 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973]; see generally *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].) In *Horn* v. *County of Ventura*

(1979) *supra*, 24 Cal.3d 605, we classified approval of a tentative subdivision map as an "adjudicatory" function, noting however that "only those governmental decisions which are *adjudicative* in nature are subject to procedural due process principles. *Legislative* action is not burdened by such requirements. [Citations.]" (*Id.* at p. 612.) Any requirement of notice on these facts, therefore, must derive exclusively from the BOE Regulations.

Section 98, subdivision (a), of the Regulations provides: "Each governing board shall conduct a public hearing ... at a time and place accessible to the community at which time parents and other interested persons may submit comments. The board shall at least 30 days in advance of the hearing publish a notice in a newspaper of general circulation in the district and shall, in addition, notify *parents of all students enrolled in the district* in the method commonly used to communicate with parents and in the primary language of the student." (Italics added.) Whether the Regulations require notice to parents of incoming ninth-graders turns on the interpretation of the word "enrolled." Plaintiffs suggest that the purpose of the notice requirement is to assure that all "interested students and their parents" are informed of the public hearing. Therefore, they reason, incoming ninth-graders —most of whom had preregistered with District high schools at the time this suit was filed—should be deemed "enrolled" for purposes of section 98, subdivision (a).

Certainly it would have been advisable for the Board to have notified parents of eighth grade students who would enter high school the following term. The Board now concedes in hindsight it should have done so. Our problem is whether this oversight must invalidate all of the Board proceedings when the good faith of the Board has been unquestioned.

The class of students affected by proposal III includes, ultimately and in a broad sense, all kindergarten, elementary school, and junior high school students attending schools that feed into District high schools. It also includes the students attending District high schools at the time the plan is implemented; although they are not required to attend different schools, the plan—if successful—will alter their educational environment. It would be an onerous burden on school districts if we were to require that personal notice be sent to the parents of all these affected students.

Moreover, as we have noted, the scope of notice required is not to be defined by reference to the "rights" of individual students and their parents, but rather by reference to the purpose of the notice requirement of section 98, subdivision (a). We believe that purpose to be to allow expression of a wide range of community views so that the Board will develop the most effective desegregation plan possible and so that the community, having had an opportunity to participate in the desegregation process, will understand and generally support the Board's choice of a remedial plan.

Here, personal notice was sent to the parents of all students then attending District high schools. Notice was also published in local newspapers of general circulation. The desegregation process was discussed at numerous public meetings of the advisory committee and of the Board. Because it appears that the District notified an adequately broad range of interested community members so that the purposes of the notice requirement were likely to be achieved, we conclude that the District substantially complied with the requirements of section 98, subdivision (a).

### 3. *The public hearing: content of notice.*

Plaintiffs next contend that the notice which the Board published and mailed to parents failed to adequately specify the criteria relied upon by the Board in making its segregation determinations. They argue that this deficiency in the content of the notice prevented the public from being able to discern the bases of the Board's decisions and that the community was consequently unable to intelligently review the Board's actions. This contention is based on section 98, subdivision (b)(1), which states:

"The published notice and the notice to parents shall include:

"(1) The names of the schools in which, in the preliminary judgment of the governing board, there exists racial or ethnic segregation of minority students, the criteria used by the board in making such determination, the names of the schools in which, in the preliminary judgment of the governing board, racial or ethnic segregation of minority students does not exist, and the criteria used by the board in making such determination . . . . "

The Board drafted a notice which summarized the desegregation policy of the BOE, described the function of the advisory committee and listed its recommendations, enumerated the five criteria which the Board and the advisory committee employed in deciding which schools were segregated, and summarized the terms of proposal III. By this notice, interested community members were sufficiently informed of the Board's decisions and the bases therefor so that they were able to meaningfully scrutinize the decisions. Community members had an opportunity to obtain further information and express their views at a public hearing held before the Board's decision became final; there is no indication that a more detailed notice would have materially increased the quality or quantity of public input. The content of the notice was therefore specific enough to satisfy the requirements of section 98, subdivision (b)(1).

The judgment is affirmed.

Richardson, J., Broussard, J., and Pacht, J.,* concurred.

**TOBRINER, J.†**—I concur in the majority opinion insofar as it affirms the validity of defendant school district's voluntary desegregation plan. I do not agree, however, with the dicta of the majority opinion (*ante*, p. 95) which purports to "disapprove" section 93, subdivision (b)(1) of title 5 of the California Administrative Code, a regulation of the State Board of Education relating to a local school board's determination of segregated schools.

First, no party in this case has challenged the validity of this regulation and thus the question of the regulation's validity is not actually before us. The local school desegregation plan at issue here, of course, did not utilize specific percentages in determining which schools in the district were segregated.

Second, contrary to the suggestion of the majority opinion, nothing in this court's decision in *Crawford* v. *Board of Education* (1976) 17 Cal.3d 876 [130 Cal.Rptr. 724, 551 P.2d 28] purports to limit the au-

---

*Assigned by the Chairperson of the Judicial Council.

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

thority of a local school board voluntarily to go beyond minimum constitutional requirements and adopt specific percentage "rules of thumb" to guide its own desegregation program. As Chief Justice Burger explained for a *unanimous* United States Supreme Court in *Swann* v. *Board of Education* (1971) 402 U.S. 1, 16 [28 L.Ed.2d 554, 566, 91 S.Ct. 566]: "School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. *To do this as an educational policy is within the broad discretionary powers of school authorities*; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court." (Italics added.)

Bird, C. J., concurred.

**NEWMAN, J.,** Dissenting.—Trial courts never should act as school boards. Yet in *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280, at page 286 [130 Cal.Rptr. 724, 551 P.2d 28] this court said: "In those instances . . . in which a court finds that a local school board has not embarked upon a course of action designed to eliminate segregation in its schools or, having done so, has not implemented *a plan that provides meaningful progress toward that goal,* a court has no alternative but to intervene and to order the school board to undertake immediately a reasonably feasible desegregation program." (Italics added.)

Only when it "*finds* that a school board has implemented *a program which promises to achieve meaningful progress toward eliminating the segregation* . . .," this court also said (*id.*), may the trial court "defer to the school board's program and . . . decline to intervene"; and it may continue to decline to intervene only for "so long as such meaningful progress does in fact follow." (Italics added.)

In this case did the trial court find that the board had implemented a program promising to achieve meaningful progress toward the elimination of segregation? The answer is No. The majority here state (*ante* p. 94, fn. 9): "We have no occasion to decide whether proposal III [see *id.* at p. 89, fn. 4] promises to achieve 'meaningful progress' toward the elimination of segregation in the District." Why have we no occasion to

decide that? Because, say the majority: "Plaintiffs failed to challenge the substantive adequacy of proposal III in the trial court, and are therefore foreclosed from doing so for the first time on appeal." (*Id.* p. 94, fn. 9.)

In paragraph 18 of their complaint, however, plaintiffs allege that "defendants have failed to comply with the requirements of those regulations and in assigning the pupils in the manner they propose to follow are acting in violation of mandates contained in those sections." (See §§ 90-101 of tit. 5, Cal. Admin. Code.) Further (in their points and authorities supporting the complaint): "Plaintiffs ... contend that there remains a substantial question of whether the schools which are involved in the proposed plan are in fact segregated and whether the requirements of the regulations respecting an equitable sharing of the burden of attempting to desegregate [have] been accomplished among the schools of the defendant district where the one school with the statistically greatest racial isolation has been left out of any participation in the proposed plan."

Referring impliedly to that allegation and that contention, plaintiffs' opening brief in the Court of Appeal argued that plan III "[suffered] from such numerous *substantive* and procedural defects" that there was, in effect, no plan at all. (Italics added.) And the Court of Appeal opinion considered at length whether the plan "promises to achieve meaningful progress" (see pp. 10-17).

On that record, I cannot agree that plaintiffs were foreclosed from raising the issue here.

Regarding the statement that "plaintiffs ... appear to challenge the substantive correctness of the determination that Camarillo High School was not segregated" (*ante*, p. 88), the majority comment: "Insofar as they do, we recognize that courts apply a deferential standard of review to such determinations" (*id.*). Yet the citations that follow, concerning "a quasi-legislative function," are hardly consistent with these words from *Crawford* (17 Cal.3d at pp. 306-307): "The key to judicial deferment to the judgment of a local school board in this area ... must lie in a school board's demonstration of its commitment to the necessity of immediately instituting reasonable and feasible steps to alleviate school segregation. . . . [¶] If, however, a court finds that a local school

board has not implemented such a course of action, the court is left with no alternative but to intervene to protect the constitutional rights of minority children."